**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0235n.06

**No. 08-6516**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Apr 15, 2010
LEONARD GREEN, Clerk

| | |
|---|---|
| AMANDA WEST, | ) |
| | ) |
| Plaintiff-Appellee , | ) |
| | ) |
| v. | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR THE |
| TYSON FOODS, INC., | ) WESTERN DISTRICT OF KENTUCKY |
| | ) |
| Defendant -Appellant. | ) |

Before:  SUTTON, KETHLEDGE and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.**  Tyson Foods, Inc., appeals the judgment entered on a jury award of compensatory and punitive damages in this sexual harassment and constructive discharge action brought under Title VII of the Civil Rights Act and its state counterpart, the Kentucky Civil Rights Act.  42 U.S.C. § 2000e, *et seq*.; Ky. Rev. Stat. § 344.040.  Tyson challenges the sufficiency of the evidence, the adequacy of the jury instructions, and the application of evidentiary rules.  We affirm.

**I.  Background**

Amanda West began working for a Tyson Foods, Inc. ("Tyson") chicken processing plant in Robards, Kentucky on January 10, 2005.  West took part in two Tyson Harassment/Discrimination Policy Trainings, where she was informed that an investigation as a result of a sexual harassment complaint would in all cases be completed within two weeks and that complaints would be kept

confidential. Tyson's harassment policy required that any Tyson employee who became aware of harassment report the incident to management, and that an employee who suffers harassment report such harassment to his or her supervisor.

West testified that within her first week of work, several male employees began harassing her. They told her she had a "nice ass," "big boobs," asked her if she had a boyfriend, and asked her to "go" with them. She was also subject to frequent "wolf whistling" and staring. These incidents occurred approximately ten to fifteen times per shift. In addition, a line-lead named Samuel Sapeda was "constantly coming up to [her] and saying sexual things . . . ."

West also testified that in her third week of employment, while she was working on an enclosed assembly line, she became aware of someone standing behind her. When she turned around, a line-lead named Jorge (a/k/a George) Ramirez tried to kiss her and their cheeks brushed. West pulled away and told him to leave her alone and that she was married. In response, Ramirez stared at her and asked her if she would go home and have sex with him. West responded that she would not and that she was married. Ramirez did not move and smiled at her "creepily." He then "grabbed his private part and he shook it at [West] and he said, suck my, you know, D-I-C-K." West told him to leave her alone, at which point Ramirez smiled and walked away. West noticed that other male co-workers on the line with her had witnessed what had just occurred with Ramirez and were laughing. West testified that she felt embarrassed, humiliated, upset and scared. She began crying, left the line and walked off the processing floor. As she was leaving, she encountered her

trainer, Odell (a/k/a "Junior") Stokes. West testified that when Stokes saw her crying, he asked what was wrong, and West described the incident with Ramirez and how scared she was.[1]

The supervisor in charge of the line, Cory Parks, noticed West and Stokes talking and West crying, approached them, and asked West what was wrong. West testified that she told Parks what she had told Stokes, and also told him about the comments, stares and wolf whistles from co-workers she had endured since she started working there. West testified that she mentioned Ramirez and Sapeda by name to Parks, and that she also pointed out some other men whose names she did not know, but who had engaged in the harassing activity. West testified that Parks' initial reaction was to tell West "don't take it offensive; that's just how they treat their women over there," and then "well, you know, you are hot," after which both he and Stokes laughed. When they realized West was not laughing, however, Parks "got serious also and promised [West] that he would see to it that it was resolved, and he asked [West] not to go to [human resources ("HR")], that he wanted to resolve it first, and he promised that he would get to the bottom of it."

Parks then asked West if she wanted to move to a different line. West testified that she did not want to transfer because her current line was an easier job. Parks asked West what she wanted to do, and West asked if she could be moved to a different section of the same line, where the line is not enclosed. Parks agreed to this. West testified that Stokes was present for this entire conversation, but Stokes testified he was unable to recall the conversation.[2]

---

[1]At trial, however, Stokes did not recall this encounter taking place.

[2]Parks' testimony of this encounter was quite different from West's. Parks claims that he approached West independently to ask if she wanted to change to another line, and she said she

West testified that, at the conclusion of their conversation, she believed Parks was going to go to human resources to have the issue resolved; however, the only other action that Parks claims he took was to "observe her for a few days."

West believed that by telling Parks, her supervisor, about the treatment she was receiving, she had complied with Tyson's sexual harassment reporting procedure. Stephanie Rackard, Tyson's Equal Employment Opportunity Commission ("EEOC") Specialist,[3] testified that under Tyson's sexual harassment policy, it is sufficient for an employee to complain to her supervisor about harassment in order for an investigation to begin, even if all she reported was "hooping and hollering" as Parks claims. West also believed that HR would learn about her complaint because she had told Stokes, who, as a fellow employee, was obligated to tell human resources under Tyson's harassment policy. Parks was disciplined by Tyson for failing to report West's conversation to human resources or bring West directly to human resources, as were Stokes and Natasha Brown, a coworker of West's with whom she also discussed the harassment.

West testified that the comments, wolf whistles and stares continued with the same frequency for the entire five weeks she was employed at Tyson. Further, West testified that between the time

would if she was not placed on an inside line. She told him she did not want to be on an inside line because when she was there "all of the Hispanic guys 'hoop and holler' at her." He claims he then asked her if she wanted to go to human resources to file a complaint, but West said "she would rather not and that it's not that big of a deal." Tyson admitted, however, that even if West said she did not want him to, under Tyson's sexual harassment policy Parks was obligated to report West's complaint to human resources.

[3]Rackard replaced Linda Walker, who was Tyson's EEOC Specialist at the time of the relevant events.

of her conversation with Parks and the end of her employment with Tyson, several other incidents occurred. West testified that Sapeda pulled her back into him and touched her breast, told her she was "hot and sexy," and groped her buttocks twice. On other occassions, unknown employees grabbed her buttocks at least twice while other employees were present and either laughed or also touched her. West testified she told her co-workers Andrea Boyken, John Fellows and Stokes about these incidents. Boyken testified that she, too, was subject to harassment while at Tyson and that her husband asked someone who worked on the processing floor to "look out for [her]". Additionally, Boyken testified that at some point during West's employment, a supervisor named Sharon Penick[4] asked Boyken about West's harassment complaint. West decided not to return to work in her fifth week after she was followed to her car one night, making her fear that she would be raped.

On the date West decided not to return to work, more than two weeks had passed since she had spoken with Parks, during which she had not heard anything further about her complaint. Rackard testified that while Tyson is conducting a harassment investigation, the victim will often not know that there is an ongoing investigation because of confidentiality concerns; however, the victim will be informed at the conclusion of the investigation.

West did not appear for her scheduled work days on February 14 to 17, 2005 and did not call Tyson to explain the cause of her absence. On February 17, 2005 she was terminated for "job abandonment." Under Tyson's attendance policy for probationary employees (i.e., employees in

---

[4] Prior to her testimony in the district court Penick changed her last name to McLevain.

their first three months of employment), termination is warranted after an employee accumulates 3.5 absentee points. By the time of her termination, West had accumulated 14 points, mostly for failing to show up for work the final four days. However, two of those points were unrelated to the harassment claims and were for leaving work early on two occasions.

On February 18, 2005, West went to Tyson to pick up her final paycheck and was told she was required to have an exit interview with HR manager Ralph Guizar before she could obtain her check. West testified that during that 45-minute meeting she told Guizar about all the harassment she had been subjected to at Tyson, that she had spoken with Parks and Stokes, that she mentioned Ramirez and Sapeda as perpetrators of some of the harassment by name, that she had pointed out a few other individuals to Parks,[5] and that Guizar took notes sufficient to fill the front and back of the exit interview form.

West testified that Guizar promised her he would start an investigation even though she no longer worked at Tyson. Guizar admitted at trial, however, that he never began an investigation into West's complaint of sexual harassment, despite it being company policy to do so, even when the employee requests that an investigation not be conducted. Rackard testified that even based on what Guizar stated was communicated to him in West's exit interview, which was less than West contends she communicated, the information conveyed was sufficient to begin an investigation under Tyson's

---

[5]Guizar's recollection of the exit interview was significantly different. He testified that West would not provide any information about her harassers other than to say they were Hispanic and that West stated she had not reported the harassment to anyone.

policy. Rackard also testified that Guizar should have been disciplined for failing to commence an investigation, but was not.

Guizar testified that following the interview he took the exit-interview notes to another HR office and deposited them in a tray on a clerk's desk, and that after meeting with West, he did not hear anything further about her until the EEOC complaint was filed. Tyson Complex HR Manager Dave Phillips testified that he reviews "just about every exit interview that comes through" on a weekly basis. Nevertheless, Tyson admitted that it did not begin an investigation into West's harassment complaint until after receiving an EEOC complaint on April 6, 2005.

Natasha Brown testified that at some point after West stopped working at Tyson, another, unnamed, female employee worked one day and then called in the next day to say she was not returning to work because she had been sexually harassed. Tyson did not conduct an investigation into this claim. Rackard testified that Tyson had a policy of offering re-employment to Tyson employees who left because of legitimate claims of harassment, but West was never offered re-employment.

When she left Tyson, West was making $9.50 an hour plus overtime at $14.24 per hour. After leaving Tyson in February 2005, West was unemployed until April 2005. She then obtained a job that paid $6.25 an hour with little overtime. She left that job in January 2006, and was unemployed until February 2007, when she obtained another job, which she held until August 2007, making $8 an hour with no overtime. In addition to the financial impact of leaving Tyson, West testified that as a result of the harassment, she is less trusting and more fearful than she used to be

and her personality has changed. One manifestation of that fear is her desire to avoid groups of men that sometimes congregate around local businesses.

On March 28, 2005, West filed a complaint with the EEOC claiming she had been constructively discharged and subject to a hostile work environment in violation of Title VII of the Civil Rights Act and the Kentucky Civil Rights Act. Tyson received the EEOC's "Charge of Discrimination" on April 6, 2005. On receiving the charge, Tyson began an investigation.

Phillips testified that he first became aware that Guizar's notes from the exit interview were missing on April 6 or 7, once the EEOC complaint arrived at Tyson. He further testified that in order to try to find the missing notes, members of the HR office searched all the files for current and recent (up to two-years old) Tyson employees kept in the HR office, which was over 2300 files. The notes were never located.

Tyson assigned Bevels to investigate West's claims. Bevels testified that although she was conducting the investigation, she was not informed of the content of West's exit interview with Guizar, and she did not speak with Guizar. Bevels and Rackard testified that Bevels did not ask Boyken about experiences of sexual harassment or speak with Sapeda, and Sapeda's name did not come up in Bevels' investigation. During her investigation, Bevels took statements from Boyken, Fellows, Stokes, Ramirez, Brown and others. Bevels forwarded the written statements to Walker at Tyson's headquarters in Arkansas, but she was not asked to draw any conclusions from her investigation and did not communicate with Walker in any other way regarding her investigation.

On July 20, 2005, Tyson responded to the EEOC inquiry. Tyson claimed that it conducted an investigation into West's claims after her exit interview, that West had not reported anything

more than "hooping and hollering" to Parks, and that she did not want him to report the matter to HR. The report to the EEOC concluded that "Ms. West was not constructively discharged because her termination was based purely on her excessive accumulation of attendance points." Rackard admitted, however, that contrary to its statements in the report that it initiated an investigation following West's exit interview, Tyson did not begin or perform any investigation into West's allegations until after receiving the EEOC complaint.

On September 26, 2005, the EEOC issued a "Notice of Right to Sue" to West. On December 21, 2005, West sued Tyson alleging violation of Title VII of the Civil Rights Act of 1964 as well as the Kentucky Civil Rights Act. Tyson then filed a motion for summary judgment, which the court denied.

During the course of the litigation, Tyson also filed a motion *in limine*, to exclude evidence of Tyson's post-termination investigation. The district court denied the motion, ruling that "[t]he post-termination investigation evidence is relevant because it supports the Plaintiff's claims Tyson 'failed to take prompt and appropriate corrective action' prior to her termination and that Tyson's response to West's allegations 'manifest indifference or unreasonableness.'"

The district court rejected Tyson's motion for a directed verdict on the hostile-work-environment claim, on the issue of punitive damages and on the issue that front pay is not available. The district court did, however, instruct the jury that front pay could not exceed five years from the time of the verdict because West had only worked at Tyson five weeks when she quit. In addition, the court ruled that it would give the jury a missing evidence instruction based on the absence of the exit-interview notes. Jury Instruction number seven read:

> Mr. Guizar's notes from the exit interview with Amanda West are missing. If you believe that the notes are missing as the result of the unjustified or careless actions or inactions of Tyson Foods, or any of its agents, then you may, but are not required to, draw an inference that the missing evidence would be favorable to the Plaintiff and adverse to the Defendant.

The court also found that Cory Parks, Ralph Guizar, Sharon Penick and Maria Robinson qualified as "supervisors" under the Tyson anti-harassment policy.

The jury found that West had been subject to a hostile work environment as a result of sexual harassment, awarded $750,000 for past and future mental distress ($500,000 for past, $250,000 for future), found that West had been constructively discharged, awarded her $65,818.29 in back pay and $64,545 in front pay, and awarded $400,000 in punitive damages.

The district court entered judgment against Tyson, awarding West compensatory damages of $880,363.29, punitive damages of $300,000 (reduced from $400,000 by the court pursuant to 42 U.S.C. § 1981a(b)(3)), and costs. Following judgment, Tyson filed a "Motion for Judgment Notwithstanding The Verdict, Or In The Alternative For A New Trial, Or In The Alternative For Remittitur." Tyson claimed that: (1) the verdicts were not supported by evidence; (2) the jury was allowed to consider irrelevant, prejudicial evidence; (3) West was not entitled to an adverse-inference jury instruction based on the lost exit-interview notes; and, (4) the compensatory and punitive damage awards were excessive. The court denied the motion for judgment as a matter of law as to liability, but granted it as to the reduction of the front pay award to its present value of $63,322.87. It also denied the motion for a new trial, as well as the alternative motion for remittitur.

**II. The District Court's Denial of Tyson's Motion for a Directed Verdict and Its Motion for a Judgment Notwithstanding the Verdict.**

Tyson first asserts that it was entitled to prevail as a matter of law. A district court's denial of a motion for judgment as a matter of law is reviewed *de novo*. *Tisdale v. Fed. Exp. Corp.*, 415 F.3d 516, 531 (6th Cir. 2005). In so doing, "[t]he evidence should not be weighed, and the credibility of the witnesses should not be questioned. The judgment of this court should not be substituted for that of the jury; instead, the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences. The motion should be granted, and the district court reversed, only if reasonable minds could not come to a conclusion other than one favoring the movant." *Id.*

In order to prevail on her claim of sexual harassment,[6] West was required to show: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment, and; (5)Tyson knew or should have known of the harassment and failed to implement prompt and appropriate corrective action. *Gallagher v. C.H. Robinson Worldwide, Inc.,* 567 F.3d 263, 270 (6th Cir. 2009); *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996). *See also* Title VII of the Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C. §2000e-2(a)(1).

---

[6]A sexual harassment claim brought under the Kentucky Civil Rights Act is to be analyzed in the same manner as a claim brought under Title VII, its federal counterpart. *Clark v. United Parcel Serv., Inc.,* 400 F.3d 341, 347 (6th Cir. 2005)(citing *Ammerman v. Bd. of Educ.*, 30 S.W.3d 793, 797-98 (Ky. 2000)).

The proper standard to apply in evaluating the fifth prong is stated in *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868 (6th Cir. 1997):

> When an employer implements a remedy, it can be liable for sex discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination.

*Id.* at 873. *See also Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 339 (6th Cir. 2008) ("[A] company may be held liable for coworker harassment if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.").

Tyson argues that no reasonable jury could have found that Tyson "knew or should have known of the alleged harassment or that Tyson's response . . . reflected an attitude of permissiveness," and that therefore West did not prove sexual harassment. Viewing the evidence in the light most favorable to West, the jury reasonably could have found that Tyson knew or should have known of the harassment and that Tyson's response reflected an attitude of permissiveness.

## A. Effective and appropriate response

Tyson argues that Parks' actions in response to West's complaint to him were so clearly appropriate that the jury could not have reasonably found otherwise. We disagree. The evidence, viewed in the light most favorable to West, was sufficient for the jury to find that the response was neither reasonably prompt nor effective.

The appropriate corrective response will vary according to the severity and persistence of the alleged harassment. *See, e.g., Calderon v. Ford Motor Credit Co.,* 300 F. App'x. 362, 371 (6th Cir. 2008). To meet the standard this Court set forth in Blankenship, 123 F.3d at 875, the actions taken

must be "reasonably calculated to end the harassment." *Jackson v. Quanex*, 191 F.3d 647, 663-64 (6th Cir. 1999).

Parks' initial response to West's complaint was to justify and perpetuate the harassment by saying "that's just how they treat their women over there" and "well, you know, you are hot." Then, after realizing that West was not amused, Parks, too, became serious. However, in response to West's complaints against numerous individuals, two identified by name and others by sight, of frequent harassing activities that were both vulgar and threatening, and that clearly upset West, Parks' only response was to move West to a different place on the processing floor, and, possibly, to watch her occasionally for the next few days. Assuming that the harassment proceeded as West claims, as we must, this action was woefully insufficient, especially in light of Parks' directive to West to refrain from reporting the matter to HR. *See Jackson,* 191 F.3d at 665 ("[I]f a remedy 'is ineffectual, liability will attach . . . an employer's actions will not necessarily shield it from liability if harassment continues." (quoting *Fuller v. City of Oakland, Cal.,* 47 F.3d 1522, 1529 (9th Cir. 1995))).

Further, a reasonable jury could have concluded from the evidence that Parks failed to take a number of steps that would clearly be necessary to establish a base level of reasonably appropriate corrective action under the circumstances, such as speaking with the specific individuals identified by West, following up with West regarding whether the harassment was continuing, and reporting the harassment to others in management. Parks' failure to do these things at any time supports the conclusion that his response was neither prompt nor appropriate. *See Jackson*, 191 F.3d at 663-64

(response that does not include attempt to determine perpetrators of harassment is not reasonably calculated to end conduct).

Tyson claims that because West did not complain to Parks a second time, Parks reasonably believed he had resolved the situation. However, there is sufficient evidence in the record for a jury to have reasonably found that Parks could not have reasonably believed the situation to be resolved after merely assigning West to a different work location.[7]

### B. Tyson's knowledge of the harassment

Tyson argues that no jury could reasonably find it culpable for creating a hostile work environment because there was insufficient evidence that it knew or should have known of the harassment that took place after West was relocated to a different position in the line. This argument too must fail because there was ample evidence that Tyson knew or should have known of the sexual harassment that West reported to Parks and that was inadequately addressed.

> An employer has actual notice of harassment when sufficient information either comes to the attention of someone who has the power to terminate the harassment, or it comes to someone who can reasonably be expected to report or refer a complaint to someone who can put an end to it. Actual notice is such notice as is positively proved to have been given to a party directly and personally, or such as he is presumed to have received personally because the evidence within his knowledge was sufficient to put him upon inquiry. In the context of sexual harassment claims, actual notice is established by proof that management knew of the harassment.

*Sandoval v. American Bldg Maintenance Industries, Inc.,* 578 F.3d 787, 802 (8th Cir. 2009) (internal brackets, emphasis and citations omitted).

---

[7]The jury might also have reasonably found that West did not report further harassment to Parks because Tyson policy stated that an investigation might take two weeks, or because Parks told her that he would "get to the bottom of the issue and that he would resolve it."

Parks was a supervisor, and an employee's supervisor was listed as one of the persons through whom an employee could report sexual harassment under Tyson's policy. *See Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999) (holding that when an employer designates certain employees as implementors of its policy, and those employees become aware of misconduct, the employer has "itself answered the question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures"); *Baugham v. Battered Women, Inc.,* 211 F. App'x. 432, 439 (6th Cir. 2006) ("Evidence a supervisor knew of the harassing conduct suffices to establish constructive notice.").  As the district court concluded:

> [I]t was reasonable for the jury to conclude that Tyson had actual knowledge because West told Parks about the sexual harassment, and Parks, as West's supervisor, was a proper contact on the Tyson sexual harassment policy.

*West v. Tyson Foods, Inc.*, No. 4:05-cv-183M, 2008 WL 5110957 at *4 (W.D. Ky. Dec. 3, 2008).

Assuming, *arguendo*, that Parks and other management did not know of the ongoing harassment that followed West's complaint, a jury could reasonably have concluded that management's ignorance was the result of Tyson's failure to respond appropriately to the original complaint by, for example, investigating the complaint, speaking to the harassers, or checking back with West, and such failure cannot be used as a shield against a claim of sexual harassment. *See Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 339-40 (6th Cir. 2008) (a jury could find management had constructive knowledge of harassment based on reporting of some instances of harassment and management only moving employee to address it).  Additionally, the jury could have

concluded that at least one other supervisor, Penick, was aware that West had complained of harassment.

Tyson likens its position to that of the employer in *Parkins v. Civil Constructors of Ill.*, 163 F.3d 1027 (7th Cir. 1998), claiming that West should have complained to other management personnel when she received no response from Parks, and since she did not, Tyson cannot be deemed to have had the requisite knowledge. However *Parkins* is distinguishable. In *Parkins*, the court held that where an employee had not received any resolution of her sexual harassment claims two years after making them, it was unreasonable of her not to report them through other channels. *Id.* at 1038. In the instant case, the time between West's initial complaint and her decision to quit was only a matter of weeks, and a large portion of this time was covered by the two-week period Tyson's policy told her to expect for an investigation. There was also evidence that it would not be unusual for West not to know if an investigation was taking place because of Tyson's concern for confidentiality.

Because there was adequate support for the verdict and Tyson is not entitled to judgment as a matter of law, we affirm the district court's denial of Tyson's motions for directed verdict and for a judgment notwithstanding the verdict.

### III.   Tyson's Motion for a New Trial

### A.  Spoliation instruction

Tyson first contends that it is entitled to a new trial because, subsequent to the district court's decision on the spoliation of evidence jury instruction and denial of Tyson's motion for a new trial, this Circuit overruled prior Sixth Circuit precedent governing the standard to apply when considering remedies for the spoliation of evidence.

The propriety of jury instructions is a question of law to be reviewed *de novo*. *Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 365 (6th Cir. 2005). On February 4, 2009, this Court, sitting *en banc*, decided *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (*en banc*). That decision liberated the federal district courts in the Sixth Circuit from adhering to state-law spoliation rules, allowing them "broad discretion in crafting a proper sanction for spoliation." *Adkins*, 554 F.3d at 652 (internal citations omitted).

This change in the law provides no basis for relief in the instant case. The jury instruction the district court gave here was merely a permissive one, allowing, but not requiring, the jury to draw a negative inference, if it concluded such an inference was warranted. Thus, the instruction was simply a formalization of what the jurors would be entitled to do even in the absence of a specific instruction. Therefore, even if the district court had not given the instruction under *Adkins*, the jury's discretion would not have been affected in any way, and thus no relief is warranted.

**B. Evidence of post-constructive discharge interview and investigation**

Tyson next claims it is entitled to a new trial because the district court erred in admitting evidence regarding West's exit interview with Guizar and the investigation Tyson conducted after receiving the complaint from the EEOC, in violation of Fed. R. Evid. 403. Tyson asserts admission of the evidence confused the jury (1) into believing that Guizar's failure to investigate West's claims was evidence supporting West's claims of sexual harassment and constructive discharge, and (2) "into believing that Tyson's liability for sexual harassment attached at this point, when there would be knowledge of the egregious sexual harassment that had not been reported before hand [*sic*]." Tyson further argues that even if the evidence was correctly admitted on the issue of punitive

damages, it was entitled to a limiting instruction under Fed. R. Evid. 105, which the trial court failed to give.

In the district court, Tyson filed a motion *in limine* to exclude this evidence, which the court denied. After the jury returned its verdict, Tyson moved for a new trial based in part on the admission of evidence regarding Guizar's exit interview and Tyson's post-EEOC charge investigation. The district court denied that motion, stating that "[a]t a minimum, West's interview with Guizar was admissible to rebut Tyson's assertion of 'good faith' compliance with Title VII for purposes of punitive damages."

A district court's decision to admit or exclude evidence is reviewed for abuse of discretion. *Barnes v. Cincinnati*, 401 F.3d 729, 741 (6th Cir. 2005). "This standard is highly deferential to the determination of the district court, and an abuse of discretion is found only when we are firmly convinced that a mistake has been made." *Early v. Toyota Motor Corp.*, 277 F. App'x 581, 585 (6th Cir. 2008). "We accord the district court '[b]road discretion . . . in determinations of admissibility based on considerations of relevance and prejudice,' and we do not 'lightly overrule' those decisions." *United States v. Penney*, 576 F.3d 297, 315 (6th Cir. 2009) (quoting *United States v. White*, 563 F.3d 184, 191 (6th Cir. 2009)).

Whether an action, or lack thereof, by the employer manifests an "attitude of permissiveness" is relevant to whether an employer failed to take prompt and appropriate corrective action leading up to the constructive discharge and therefore is liable for constructive discharge. However, because the asserted constructive discharge here had already occurred by the time of Guizar's exit interview—West decided not to return to work on February 10, 2005 and did not have the interview

with Guizar until February 18—Tyson's failure to conduct an investigation after the interview could not, on a purely chronological basis, be relevant to the constructive discharge claim itself.

Although the evidence relating to West's exit interview and Tyson's post-EEOC charge investigation was not relevant to the claim of constructive discharge, the evidence was relevant to the jury's consideration of punitive damages. A plaintiff may collect punitive damages under Title VII if the plaintiff establishes that (1) the employer acted with knowledge that its actions may have violated federal law, and (2) the employees who discriminated against her are managerial agents acting within the scope of their employment. However, an employer may avoid liability nonetheless if it shows that it engaged in good-faith efforts to implement an anti-discrimination policy. *Parker v. Gen. Extrusions, Inc.,* 491 F.3d 596, 602-03 (6th Cir. 2007).

In assessing an employer's good faith, it is appropriate to consider not only whether "the defendant employer had a written sexual harassment policy" but also "whether the employer effectively publicized and enforced its policy." *Id.* Evidence of the actions that Guizar took, or the lack thereof, following the exit interview, and Tyson's eventual investigation and response to the EEOC, go directly to whether Tyson attempted to enforce its policy in good faith. *See Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 483 (7th Cir. 2003) ("Because a jury could have found that [the employer] engaged in a cover-up rather than a good faith investigation of [the employee]'s retaliatory discharge claim, we find that the punitive damages issue was properly before the jury."). Accordingly, the district court did not abuse its discretion in finding the evidence relevant.

Tyson also argues that the admission of evidence concerning West's exit interview confused the jury "into believing that Tyson's liability of sexual harassment attached at this point, when there

would be knowledge of the egregious sexual harassment that had not been reported before hand [*sic*]." Tyson has not met its high burden of showing abuse of discretion on this claim. When assessing evidence as to whether its prejudicial impact outweighs its probative value, the district court is required to "look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006). Here, the prejudicial impact was minimal in light of the substantial evidence, apart from the exit interview, supporting that Tyson knew or should have known of the harassment; the probative value was considerable when evaluating West's claim for punitive damages.

Tyson further complains that it was prejudiced because it was never given an opportunity to request a limiting instruction under Fed. R. Evid. 105, because it was not until the court ruled on Tyson's motion for a judgment notwithstanding the verdict that the court held that the post-termination evidence was relevant "[a]t a minimum" to the punitive damages claim. But nothing in the district court's response to Tyson's prior motion *in limine* regarding the post-termination investigation evidence, which stated that the evidence was relevant to gauging Tyson's indifference or unreasonableness in response to the harassment, precluded Tyson from seeking a limiting instruction, even if it thought it was unlikely to succeed. Indeed, the clear language of Rule 105 states that such an instruction will only be given if requested.

Where a party fails to request a limiting instruction, this Court reviews for plain error. *Rush v. Ill. Cent. Ry.,* 399 F.3d 705, 721 (6th Cir. 2005). Plain error is an egregious error, one that leads to a miscarriage of justice. *United States v. Busacca*, 863 F.2d 433, 435 (6th Cir. 1988); *see also EEOC v. Allen Petroleum Co. of East Tenn., Inc.*, 89 F.3d 833, at *5 (6th Cir. 1996) (unpublished

decision) (plain error only where evidence admitted without instruction is "extremely damaging, the need for instruction is obvious, and the failure to give it so prejudicial as to affect the substantial rights of the accused." (quoting *United States v. Sisto*, 534 F.2d 616, 623 (5th Cir. 1976)). Here, because there was ample evidence supporting the jury's finding of sexual harassment and constructive discharge, even absent Guizar's failure to conduct an investigation after the exit interview, Tyson has not shown plain error warranting reversal.

We therefore affirm the district court's dismissal of Tyson's motion for a new trial.

## IV.     Reduction of the Judgment Amount

### A.  Punitive Damages

Tyson next argues that there was insufficient evidence to support the submission of the punitive damages issue to the jury. Review of a district court's denial of judgment as a matter of law is *de novo*. *Tinsdale v. Fed. Express Corp.*, 415 F.3d 516, 531 (6th Cir. 2005). We find no error.

Title VII allows a jury to award punitive damages "if the complaining party demonstrates that the respondent engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a. In *Kolstad v. American Dental Assoc.,* 527 U.S. 526 (1999), the Supreme Court held that "[t]he very structure of § 1981a suggests a congressional intent to authorize punitive awards in only a subset of cases involving intentional discrimination." *Kolstad*, 527 U.S. at 534. The Court provided a three-part inquiry for determining whether punitive damages are proper under Title VII:

> First, the plaintiff must show that the individuals perpetrating the discrimination
> acted with malice or reckless disregard as to whether the plaintiff's federally
> protected rights were being violated. To meet this standard, those individuals must

at least discriminate in the face of a perceived risk that its [*sic*] actions will violate federal law.

Second, in order to impute liability to the employer, common[-]law rules of agency apply . . . . [T]he principal-employer is liable[] only if the agent was employed in a managerial capacity and was acting in the scope of employment . . . .

Last, even if the plaintiff is successful in proving the first two inquiries, the defendant can nonetheless avoid liability for punitive damages if it can show that it engaged in good faith efforts to comply with Title VII. This modification of the common law agency rules is necessary in order to support and reward employers who are instituting one of the main goals of Title VII: prevention of work-place discrimination. With this in mind, courts interpreting this criteria since *Kolstad* have focused both on whether the defendant employer had a written sexual harassment policy and whether the employer effectively publicized and enforced its policy.

*Parker v. General Extrusions, Inc.*, 491 F.3d 596, 602-03 (6th Cir. 2007) (citing *Kolstad*, 527 U.S. at 536-46) (internal citations, brackets and ellipses omitted).

Under the first prong of the analysis, "a plaintiff may demonstrate the requisite mental state by showing that the relevant individuals knew of or were familiar with the anti-discrimination laws and the employer's practices for implementing those laws" or "by showing the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions." *Hall v. Consol. Freightways Corp. of Del.*, 337 F.3d 669, 675 (6th Cir. 2003). This analysis "does not require that an employer know for sure that it acted in violation of federal law in order to be liable for punitive damages under Title VII. Rather, *Kolstad* holds that punitive damages are warranted when the employer engages in conduct that carries with it a '*perceived risk* that its actions will violate federal law.'" *EEOC v. Harbert-Yeargin, Inc.,* 266 F.3d 498, 513 (6th Cir. 2001) (quoting *Kolstad,* 527 U.S. at 536). "In general, courts have found this element met where the plaintiff shows the supervisors involved in the decision at issue had anti-discrimination training or

even very general knowledge about anti-discrimination laws or an employer's anti-discrimination policies." *Sackett v. ITC Deltacom, Inc.*, 374 F.Supp.2d 602, 612 (E.D. Tenn. 2005) (collecting cases).

The district court found that there was sufficient evidence for the jury to find that this prong was satisfied because the jury could have believed that Parks' failure to report West's complaint to HR was done in the face of a perceived risk that his inaction would violate federal law. We agree.

There was ample evidence that both Parks and Guizar were aware of Tyson's sexual-harassment policy, yet both failed to conduct an investigation, as the policy requires, although both promised West they would do so. There was also evidence, such as Tyson's claims in its report that it conducted an investigation immediately following West's exit interview, indicating that Tyson may have attempted to mislead the EEOC in its response to the charge. And, given that competing accounts of various events were given during trial, and viewing the facts most favorably to West, the jury could have considered some of Tyson's opposing accounts untruthful. *See Sackett,* 374 F.Supp.2d at 611 ("[D]iametrically opposed testimony from the parties' witnesses provides support for the conclusion that the defendant's employees were not truthful in their actions." (citing *Hall*, 337 F.3d at 675)). We thus conclude that the district court properly submitted the issue to the jury, and the jury reasonably could have found the requisite mental state.

Regarding the second prong, Tyson did not contest that Parks or Guizar were managerial-level employees, and so we review the district court's determination for plain error. Given that Parks

was listed as a proper contact under Tyson's policy,[8] the district court cannot be said to have committed plain error in concluding that there was sufficient evidence for the jury to find that Parks was a managerial employee for purposes of awarding punitive damages.

Even if both prongs are satisfied, however, an employer will not be subject to punitive damages if it can show good-faith efforts to comply with Title VII. An employer will not be shielded simply by having an anti-discrimination policy. It must demonstrate that it engaged in good-faith efforts to implement that policy. *Hall*, 337 F.3d at 675. "While an employer's institution of a written policy against discrimination may go a long way toward dispelling any claim about the employer's reckless or malicious state of mind . . . such a policy is not automatically a bar to the imposition of punitive damages." *Harbert-Yeargin, Inc.,* 266 F.3d at 514 (quoting *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 446 (4th Cir. 2000) (internal brackets omitted)). The trend among the Circuits is to "focus[] on the implementation, rather than the mere existence, of any antidiscrimination policy." *Sackett*, 374 F.Supp.2d at 616.

Here, although there was evidence that Tyson communicated its policy to its employees with some frequency, there was also substantial evidence that the policy was disregarded in its implementation and enforcement. There was evidence of widespread disregard of the policy by employees in engaging in harassment, by supervisors in not reporting to HR incidents of harassment or failing to conduct follow-up investigations, by co-workers in not reporting incidents of harassment, and by HR managers in not investigating reports of harassment. Further, the

---

[8]Guizar, Penick and Walker's positions were also listed by Tyson under the harassment policy's "Notification Roster."

investigation, when it did take place, was, as the district court stated, "notably flawed." Tyson's complete failure to follow through, twice, on complaints of harassment by West, followed by a deficient investigation in response to the EEOC's inquiry, does not fulfill "Title VII's objective of motivating employers to detect and deter Title VII violations." *Kostad*, 527 U.S. at 546. Therefore, the court properly submitted the question of Tyson's good-faith efforts to the jury.

We affirm the district court's denial of Tyson's motion for a judgment as a matter of law on the issue of punitive damages.

**B. Front and back pay**

**i. <u>Constructive discharge</u>**

Tyson argues that there was insufficient evidence, as a matter of law, for the jury to find that West was constructively discharged, and that therefore the awards of front and back pay must be overturned. This Court reviews a district court's denial of judgment as a matter of law on the issue of constructive discharge *de novo,* "examining whether there is sufficient evidence to support the jury's verdict when reviewed in the light most favorable to the prevailing party." *Moore v. Kuka Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir. 1999).

A claim of constructive discharge requires a determination that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Held v. Gulf Oil Co.,* 684 F.2d 427, 432 (6th Cir. 1982). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Logan v. Denny's Inc.,* 259 F.3d 558, 569 (6th Cir. 2001). An employer's intent can be shown if the employee quitting is a foreseeable consequence of the employer's actions.

*Id.* at 573. An employee who quits has "an obligation not to assume the worst, and not to jump to conclusions too fast." *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991).

Viewing the facts in the light most favorable to West, there was sufficient evidence for the jury to find that West was constructively discharged. One factor that this Circuit has held to be relevant to the first prong of this analysis is whether the employer tolerated "badgering, harassment, or humiliation." *Logan*, 259 F.3d at 569 (quoting *Brown v. Bunge Corp.,* 207 F.3d 776, 782 (5th Cir. 2000)). Further, "harassment so intolerable as to cause a resignation may be effected through co-worker conduct." *Pennsylvania State Police v. Suders,* 542 U.S. 129, 148 (2004). As discussed *supra*, Tyson, through Parks, and possibly Penick, was aware of numerous incidents of harassment against West and failed to adequately address them. The jury could have reasonably found that this evidenced a deliberate choice to allow intolerable working conditions. *See Hafford v. Seidner,* 183 F.3d 506, 513 (6th Cir. 1999) ("An employer is liable if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action.").

The analysis then turns to whether West's leaving her employment due to the harassment was intentional or foreseeable. *See Logan,* 259 F.3d at 573 (equating employer intention with foreseeability) (citing *Moore*, 171 F.3d at 1080 (intention found where employment circumstances "would lead [an employee] to believe that he was no longer wanted.")). Again, there was sufficient evidence for a jury to conclude that West's resignation was foreseeable and even to be anticipated. It is foreseeable that, after weeks of continuous physical and verbal harassment that goes unaddressed, an employee in West's position would choose to resign. Further, it cannot be said that West "assumed the worst" or "jumped to conclusions." She waited beyond the two-week period

from her initial complaint to Parks within which Tyson policy assured her an investigation would be completed, and an employee subject to continuous verbal and physical harassment is not "jumping to conclusions" when she resigns under those conditions.[9]

### ii.  Sufficiency of the Evidence for Front Pay

Tyson next claims that the front-pay award must be vacated because it is too speculative, arguing (1)  West's work history prior and subsequent to her employment at Tyson shows that she was unlikely to be a long-time employee there, (2) because the Tyson Robards plant had a high turnover rate, it is unlikely statistically that West would have stayed at Tyson eight years, and (3) because West was only 1.5 points shy of the 3.5 absentee point limit for the probationary period, exclusive of the points she amassed once she quit, she would likely not have stayed through the probationary period.

"Front pay has been defined as an affirmative order designed to compensate the plaintiff for economic losses that have not occurred as of the date of the court decree, but that may occur as the plaintiff works toward his or her rightful place." *Shore v. Fed. Exp. Corp.*, 777 F.2d 1155, 1158 (6th Cir. 1985).  "The back pay award is limited by the date judgment is entered in a case.  Thus, without a front pay award or reinstatement, the plaintiff is uncompensated for the time between the date of judgment and the date the plaintiff attains the position he or she would have occupied but for the discrimination.  Front pay is therefore simply compensation for the post-judgment effects of past discrimination." *Id.* at 1158.  "While the determination of the precise amount of an award of front

---

[9]Tyson also makes a vague claim to the *Ellerth/Faragher* affirmative defense discussed in *Suders,* 542 U.S. at 148-49.  Tyson did not raise this defense in the district court and so waived it.

pay is a jury question, the initial determination of the propriety of an award of front pay is a matter for the court." *Arban v. West Pub. Corp.*, 345 F.3d 390, 406 (6th Cir. 2003).

A district court's award of front pay damages is reviewed for abuse of discretion. *Madden v. Chattanooga City Wide Serv. Dept.,* 549 F.3d 666, 679 (6th Cir. 2008). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment. A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Betts v. Costco Wholesale Corp.,* 558 F.3d 461, 467 (6th Cir. 2009) (quoting *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir. 2004)). "[W]e have long held that 'because future damages are often speculative, flexibility and wide discretion are especially important when a court's remedies for a Title VII violation include front pay.'" *Shore*, 42 F.3d at 378. Nevertheless, some basis must appear in the record for such an award. *Shore,* 777 F.2d at 1160.

The jury awarded West front pay in the amount of $64,545, which the district court later reduced to its present value of $63,322.87. In the jury instructions, the district court capped the front pay award at five years. We find no error.

West presented evidence of her attempts at mitigation through seeking and obtaining other jobs, and the suitability, availability and comparability of those jobs, including the pay and overtime differences. Further, the district court, in its ruling on Tyson's argument, and in its initial decision to cap any front pay at five years, cited sufficient factual support and provided adequate reasons for allowing front pay.

The only argument that the district court did not address, because Tyson raises it here for the first time, is that the turnover rate at the Tyson Robards plant supports its position that the front pay award was speculative. Even if Tyson had not forfeited this argument by failing to raise it below, it would be rebutted by the same evidence the district court looked to in deciding that West had a fair probability of surviving the probationary period, i.e., West's testimony that the job was "ideal" because it gave her an opportunity to earn overtime and to alternate child care duties with her husband thereby avoiding child care costs, Penick's testimony that West was a "good worker," and Phillips' testimony that once an employee survives the probationary period, Tyson is "probably going to have a career employee."

We therefore hold that the front pay award was not speculative and affirm the district court.

### iii. Remittitur of the Compensatory Award

Tyson claims the district court erred by not remitting the compensatory damages award because: (a) it was greater than the amount requested by West and (b) was the result of prejudice and bias by the jury against Tyson for employing Hispanics. This court reviews a district court's denial of remittitur under a highly deferential standard.

> We undertake a highly deferential review of the district court, which itself is sharply limited in its ability to remit a jury verdict. A jury verdict should not be remitted by a court unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss. Our remittitur standard favors maintaining the award, unless the award is (1) beyond the range supportable by proof or (2) so excessive as to shock the conscience, ... or (3) the result of a mistake. A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court.

*Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 905 (6th Cir. 2004) (internal quotations and citations omitted); *see also Ardingo v. Local 951, United Food and Commercial Workers Union*, No. 08-1078, 2009 WL 1528505 (6th Cir. 2009) ("The defendant's arguments in favor of remittitur do little more than emphasize the uncertain and speculative nature of [plaintiff]'s damages, a fact that is almost certainly present to some degree in any case where front pay damages are available. Those arguments simply do not overcome the high degree of deference that is owed to the trial court's ruling, and therefore, this court will not second guess the trial court's conclusion that the jury award is not shocking to the conscience.").

At trial, West requested that the jury award up to $500,000 in compensatory damages; the jury awarded $750,000—$500,000 in compensatory damages for West's past emotional distress and $250,000 for her ongoing emotional distress. As it did in the district court, Tyson cites *Denhof v. City of Grand Rapids,* 494 F.3d 534 (6th Cir. 2007), in support of its position that an award of compensatory damages award beyond that requested by the plaintiff must be remitted. The district court held that "*Denhof* cannot be read as standing for the proposition Defendant advances, i.e., that an award above counsel's request must be remitted." We, too, find that *Denhof* does not control here.

Although *Denhof* does provide some support for Tyson's position, ("[p]resumably, the plaintiffs' attorneys requested the amount of damages they believed were supported by the evidence," *id.* at 547), the amount requested by the attorneys is only one factor to be considered in assessing whether a jury verdict should be remitted on the basis that "it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *Id.*

In *Denhof*, this Court affirmed the district court's grant of remittitur. In concluding that the district court did not abuse its discretion in reducing the award, this Court noted that the jury's award of $1 million to each plaintiff was in excess of the amount requested. The court did not hold that any award in excess of that requested by a plaintiff must be remitted. Further, in *Denhof* the Court observed that the plaintiff had presented no evidence of "long-lasting mental injuries," while West did present evidence of on-going mental consequences of the harassment. *See Turic v. Holland Hospitality, Inc.,* 85 F.3d 1211, 1215 (6th Cir. 1996) (A plaintiff is only required to present competent evidence that the defendant's unlawful actions caused emotional distress, and may do so through her own testimony.).

Tyson also claims that the jury's compensatory damages verdict was influenced by prejudice against Hispanics. While it is true that during the trial there was much mention of the ethnicity of some of West's co-workers and harassers, it is pure conjecture to surmise that this affected the jury's verdict, or that the jury was biased in any way.

Tyson also argues that the compensatory damages award here is anomalous in the context of compensatory damage awards in other, "similar," cases. "[A]n appellate court should not attempt to reconcile widely varied past awards for analogous injuries which in the abbreviated appellate discussion of them seem somewhat similar." *Moody v. Pepsi-Cola Metro. Bottling Co., Inc.,* 915 F.2d 201, 211 (6th Cir. 1990) (internal quotations omitted); *see also Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 905 (6th Cir. 2004) ("Endeavoring to compare awards is difficult and often unfruitful, because the factual circumstances of each case differ so widely and because it places reviewing courts in the position of making awkward assessments of pain and suffering better left to

a jury."). Therefore, we find that the district court did not abuse its discretion in denying Tyson's motion for remittitur.

Based on the foregoing, we affirm the district court.