NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0136n.06

No. 19-1697

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ANTHONY CHANEY, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Mar 09, 2020 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| HAWORTH, INC., | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellee. | ) | |

Before: MERRITT, THAPAR, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Anthony Chaney worked as a production supervisor for furniture manufacturer Haworth, Inc. After several warnings for poor performance, Haworth terminated Chaney's employment. Chaney sued Haworth, alleging a hostile work environment and race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Michigan's Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.*[1] The district court granted summary judgment to Haworth on both claims. For the reasons stated, we AFFIRM.

---

[1] Chaney also claimed retaliation in violation of Title VII and the Elliot-Larsen Act. The district court granted Haworth summary judgment on Chaney's retaliation claim because Chaney failed to respond to the arguments made by Haworth regarding the retaliation claim in its motion for summary judgment. Chaney does not challenge this ruling on appeal, so we will not discuss the retaliation claim further.

I.

Haworth manufactures commercial office furniture and related products. The company hired Chaney, who is African American, on July 5, 2016, as a production supervisor at Haworth's Laminated Products Plant. Chaney managed roughly thirty employees. In the first few weeks, Chaney received training (which he says was useless) and had several informal coaching meetings with his direct supervisor, Tina Pietrangelo.

It was not long before Pietrangelo began noticing problems with Chaney's work. In August and September 2016, Pietrangelo met with Chaney twice to discuss performance and communication issues. Then, on October 17, 2016, she issued Chaney a "Documented Warning [for] Unsatisfactory Performance." The five-page letter raised many specific concerns about Chaney's ability to perform his job and professionally communicate with others. Chaney was required to create a written plan to fix the problems.

Meanwhile, on October 3, 2016, Chaney told Human Resources Business Partner Tina Porcelli about an email he had received in August 2016 from another employee, William Johns. The email contained an image from the comedy film, "Friday," depicting two African American men rolling a marijuana cigarette. The subject of the email was "On Again." Porcelli confronted Johns about the email. Johns explained that he had sent the email to Chaney "because the two of them were discussing the movie earlier that night and, when he returned home following work, he found the movie on the television. So he took a picture of the movie and forwarded it to Mr. Chaney with the cover message indicating that it was 'On Again.'" Another employee confirmed that the conversation about the movie had taken place. Porcelli met with Johns and Chaney together. After Johns explained why he had sent the email, Chaney remembered that they had talked about the movie. According to Porcelli, "Mr. Johns apologized for any unintended

offense he may have caused, and Mr. Chaney accepted the apology. Their conversation ended with a fist-bump after Mr. Johns asked, 'Are we okay, man?' and Mr. Chaney responded, 'yeah.'" Chaney does not dispute this account. Johns nonetheless received a written warning for using "company email for a personal use that caused concern for another member."

On November 8, 2016 (election night), Chaney "overheard someone from the engineering department say, '[a]fter tonight, we'll be done with that n***** Obama.'" According to Chaney, he reported the comment to Pietrangelo, who said she would look into it.

Chaney's job performance did not improve, and on November 23, 2016, Pietrangelo issued Chaney a "Final Warning [for] Leader Behavior/Performance Below Expectations." The letter discussed workplace problems occurring after the first warning letter, contained detailed expectations and requirements for Chaney going forward, and warned him that if he failed to meet the expectations, he faced "severe disciplinary action up to and including termination of [his] employment." Six days after receiving the letter, Chaney met with Haworth's Vice President of Global Human Resources, Ann Harten. Chaney "shared his concern that [the] documented performance warnings that he had received from his supervisor, Tina Pietrangelo, were the result of racial bias and that his supervisor treated him unfairly." Harten immediately appointed Marsha Major, a Senior Human Resources Business Partner, to investigate Chaney's concerns.

The day after Chaney met with Harten, Chaney opened a compartment above his desk and found a Chewbacca figurine from the Star Wars movie series suspended from its arms by a pair of earplugs. Haworth security responded immediately. Chaney then had security call the police, who responded and investigated the incident. After a police officer questioned Chaney, Chaney left work. He then took two weeks of medical leave. Haworth removed the figurine before Chaney returned to work on December 12, 2016.

Marsha Major, whom Haworth had appointed to investigate Chaney's concerns about his work environment and his relationship with Pietrangelo, also investigated the Chewbacca incident. She interviewed Chaney and several other employees but was never able to determine who had placed the figurine in the overheard compartment.

After Chaney returned to work, Pietrangelo extended the deadlines for him to complete the requirements detailed in the final warning letter. But Chaney made no progress, and Haworth terminated his employment on February 13, 2017. The termination letter detailed Chaney's failure to meet the expectations and requirements set forth in the final warning letter. The letter concluded that Chaney had "demonstrated that [he] is unwilling to perform at the level necessary to meet Haworth expectations."

Chaney sued Haworth, alleging a hostile work environment and race discrimination in violation of Title VII and the Michigan Elliot-Larsen Civil Rights Act. The district court granted Haworth's motion for summary judgment and dismissed the case. Chaney now appeals.

## II.

"We review a district court's summary judgment decision de novo, applying the same standards the district court used." *Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 275 (6th Cir. 2018). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We consider the facts and all related inferences "in the light most favorable to the party against whom summary judgment was entered." *Franklin*, 910 F.3d at 275 (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)).

*Hostile Work Environment*. Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[2]  42 U.S.C. § 2000e-2(a)(1).  "[R]equiring people to work in a discriminatorily hostile or abusive environment" runs afoul of this provision.  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  To prevail, Chaney must prove "that (1) [he] belonged to a protected group, (2) [he] was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) [Haworth] knew or should have known about the harassment and failed to act."  *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011).  The district court determined that Chaney had failed to establish the fourth and fifth elements of his hostile work environment claim.  We agree with the district court that Chaney has failed to establish the fifth element, and so we need not consider the fourth.

"[T]he fifth element requires a plaintiff to demonstrate a basis for holding the employer liable for the harassing conduct of an employee's coworkers."  *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013).  For Haworth to be liable, Chaney must show that Haworth's "response to [his] complaints 'manifest[ed] indifference or unreasonableness in light of the facts the employer knew or should have known."  *Id.* (second alteration in original) (quoting *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008)).  This court has said that "[a] response is adequate if it is reasonably calculated to end the harassment."  *Id.* (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999)).  "Steps that would 'establish a base level of reasonably

---

[2] Chaney asserted hostile work environment and race discrimination claims under Title VII and Michigan's Elliot-Larsen Civil Rights Act.  We do not address these claims separately.  We generally analyze claims under Title VII and the Elliot-Larsen Civil Rights Act using the same tests, and Chaney does not argue otherwise.  *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012); *Peña v. Ingham Cty. Road Comm'n*, 660 N.W2d 351, 358 n.3 (Mich. Ct. App. 2003).

appropriate corrective action' may include promptly initiating an investigation to determine the factual basis for the complaint, 'speaking with the specific individuals identified by [the complainant], following up with [the complainant] regarding whether the harassment was continuing, and reporting the harassment to others in management.'" *Id.* (alterations in original) (quoting *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 633 (6th Cir. 2010)).

No reasonable jury could conclude that Haworth "failed to act" in response to Chaney's complaints. *Williams*, 643 F.3d at 511. First, Haworth responded appropriately to the email incident. Once Chaney told Porcelli about the email from Johns, Porcelli investigated, speaking with Johns and two other employees. She then met with Johns and Chaney together, where Johns explained that the email stemmed from a conversation he and Chaney had had about the movie. Johns apologized to Chaney, and the two parted ways amicably. Despite the apparently innocent motive behind the email, Porcelli issued Johns a written warning for sending it. Haworth thus acted as soon as it learned of the incident, investigated it, and disciplined Johns for his action. Chaney does not say what more Haworth should have done. We can only conclude then that Haworth acted appropriately.

Haworth also responded appropriately to the Chewbacca incident. Haworth security arrived immediately after Chaney found the figurine. At Chaney's request, security contacted the police, who responded shortly thereafter. The police investigated the incident, although they were apparently unable to determine who had placed the figurine in the overheard compartment. In addition, Haworth took steps to address Chaney's concern that the Chewbacca figurine was a threat, including offering Chaney additional security measures, which he declined.

Haworth also conducted its own investigation. Major interviewed Chaney three times. She questioned several other employees about the Chewbacca incident and about a potentially racially

hostile work environment at Haworth. The employees told Major that there were no rumors about the incident and that no one on the floor was talking about it. Ultimately, Major could not determine who had placed the Chewbacca figurine in Chaney's desk. That said, no further incidents followed.

Chaney calls the investigation a sham, saying that it was focused more on his personal life and job performance than on the Chewbacca incident. He posits that the investigation was done to pad his employment file in preparation for his subsequent termination and future litigation. There is no dispute that the investigation went well beyond the Chewbacca incident. That is not surprising, however, given the events immediately preceding the incident. Chaney had received the final warning letter only seven days before, so there were already significant questions about his future employment at Haworth. And the day before the incident, Chaney had told Harten that he thought the performance warnings "were the result of racial bias and that his supervisor treated him unfairly." Harten had then appointed Major to investigate Chaney's concerns. Major's task, therefore, was to investigate both of Chaney's concerns: the Chewbacca incident and his claim that his performance warnings were unfair and racially biased. It was entirely reasonable then for Major's investigation to consider things such as Chaney's relationship with other employees and his ability to do the job.

Chaney faults Haworth for failing to review security camera footage or facility access records to identify who placed the figurine in the overhead compartment. But the uncontradicted testimony is that there were no security cameras in the area of Chaney's desk. In addition, badge access was only required to enter the plant, not to access the supervisors' work area. So little could have been gleaned from these sources.

Finally, Chaney faults Major for not reviewing the police report as part of the investigation. But the police report is not in the record. All we know about the police investigation is that it closed, presumably without finding the culprit. Chaney admits that he has a copy of the police report, but he does not say what helpful information it contains; nor did he make it part of the record. So Chaney's argument regarding the police report falls short of showing that Major's investigation was deficient.

The law requires an employer to take reasonably appropriate corrective action once it learns of harassment. *Waldo*, 726 F.3d at 814. Haworth's response was reasonable given the circumstances. Major conducted a full investigation into the Chewbacca incident. She interviewed Chaney multiple times and spoke with several individuals about the incident. Although the investigation ultimately did not identify who put the figurine in Chaney's desk, that alone is insufficient to render Haworth's response unreasonable.

Nor do we believe Haworth can be charged with failing to respond to the election-night comment. Chaney said that he told Pietrangelo about overhearing an unidentified coworker use the word "n*****" to describe President Obama. Pietrangelo denies that Chaney told her about the comment. Regardless of that factual dispute, Major did a full investigation of whether there was a racially hostile environment at Haworth after Chaney expressed his concern that his performance warnings were based on racial bias. According to Harten, who asked Major to investigate, Chaney's concerns about racial bias were based on the "Friday" email sent by Johns. He made no mention to her of the election-night comment. Nor did Chaney mention it when he met with Major three times during her investigation. When explaining his concerns, Chaney mentioned only the email incident and the Chewbacca incident, as well as expressing his general belief that "Haworth is a racist company." Despite several discussions about the perceived racial

hostility at Haworth, Chaney never mentioned the election-night comment. (Nor did he include it in his complaint, for that matter.) Had Chaney disclosed the incident, Major could have investigated it. Chaney's silence made that impossible. We cannot conclude, therefore, that Haworth failed to respond appropriately.[3]

In sum, Chaney has not established that Haworth failed to act in response to the alleged instances of harassment. He has not met his burden of establishing the fifth element of his hostile work environment claim.

*Race Discrimination.* Chaney's race discrimination claim is based on indirect evidence. As a result, Chaney bears the burden of making "a prima facie case of discrimination by showing '1) that he was a member of a protected class; 2) that he was discharged; 3) that he was qualified for the position held; and 4) that he was replaced by someone outside of the protected class.'" *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012) (quoting *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009)). If he makes such a showing, the burden shifts to Haworth to "present a legitimate, nondiscriminatory reason for the termination." *Id.* at 592–93. Chaney must then "show that [Haworth's] proffered nondiscriminatory reason was pretext." *Id.* at 593. We need not decide whether Chaney has made a prima facie case of discrimination. He is unable to show that Haworth's reason for Chaney's termination—his poor performance—was pretextual.

---

[3] In an affidavit attached to his response to Haworth's motion for summary judgment, Chaney mentioned for the first time three racist comments he allegedly heard while employed at Haworth. We cannot consider these comments. Chaney "may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Read v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). At his deposition, after he described the election-night comments, Chaney was asked: "Was there anything else that happened in your work environment where you heard racial comments?" Chaney responded, "No other racial comments that I heard." Chaney's later-filed affidavit with new allegations of racial comments directly contradicts this testimony.

Chaney's opening brief touches on pretext only cursorily. He argues that Haworth's assessment of his workplace performance was based entirely on the subjective opinions of Pietrangelo, not on any objective measure. He says he presented objective evidence to show that his performance was above average compared to other supervisors.

Chaney severely downplays the thoroughness and detail of his warning and termination letters. The first documented warning, a four-page letter, asserted that Chaney was not performing adequately as a supervisor—he failed to take ownership of his team, came unprepared to meetings, displayed poor judgment, and caused confusion in communicating with his team. The letter provides many specific examples of Chaney's substandard performance in these areas, including his failure to run and monitor machinery as instructed; his decision to shut down the production line early due to his negligent assessment of production demand; his failure to complete required forms regarding production and orders; his negative attitude in response to critiques; and his lack of communication and teamwork with other shifts. The warning letter required Chaney to create an action plan to fix the performance issues.

The final warning letter was similarly detailed. The letter provided examples of issues that occurred after the first warning letter. These included Chaney's failure to come prepared to meetings; his failure to answer honestly when confronted; and his failure to work with human resources to address concerns with other employees. The letter also included several examples of Chaney's failure to "take ownership for [his] team and . . . continued inability to be decisive and make decisions accordingly." The letter contained detailed expectations and requirements for Chaney going forward and warned him that if he failed to meet them, he faced "severe disciplinary action up to and including termination of [his] employment."

The termination letter detailed Chaney's failure to meet the expectations and requirements set forth in the final warning letter. These included Chaney's failure to submit several action plans required by the final warning letter and his submission of inadequate or late action plans; his continued failure to take ownership of his team, including "ensur[ing] standard work, that standard work is being followed, and that those who operate the machines have been trained properly"; his failure to obtain coverage for his position when he left work early; and his continued negative attitude, including negative comments about other employees and defensive and aggressive interactions with other employees. The letter concluded that Chaney "demonstrated that [he] is unwilling to perform at the level necessary to meet Haworth expectations."

Despite the numerous documented performance issues (and many more detailed in the letters not described here), Chaney offers little support for his argument that the performance issues given for his termination were pretextual. The only evidence he marshals is nine daily productivity reports, which he says show that his performance was above average among shift supervisors. According to Chaney, the nine productivity reports show that his team outperformed others at the plant.

These reports, which measure the combined performance of multiple teams, not just the performance of Chaney or his team, cover only nine days out of Chaney's seven months with Haworth. Haworth objects that these reports show little about Chaney's performance, even for the nine days at issue, and to the extent that they do measure his performance, Chaney's performance was worse than his peers. We need not decipher the performance reports. Even if we read them as establishing that Chaney's performance was above average on those nine days, that evidence, which is all Chaney offers, is wholly insufficient to rebut the many documented performance issues in the three letters supporting Chaney's termination. Moreover, many of the issues that led to his

termination went beyond his team's ultimate output, including his poor communication, his negative attitude, and his failure to comply with the final warning letter's requirement that he create action plans to address his performance deficiencies. The productivity reports do nothing to rebut these reasons. Chaney has failed to meet his burden of establishing pretext. *Griffin*, 689 F.3d at 592.

\* \* \*

We AFFIRM.