RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0217p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

THERESA WALDO,

　　　　　　*Plaintiff-Appellee,*

　　*v.*

CONSUMERS ENERGY COMPANY,

　　　　　　*Defendant-Appellant.*

No. 12-1518

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:06-cv-00768—Janet T. Neff, District Judge.

Argued: March 7, 2013

Decided and Filed:  August 9, 2013

Before:  MOORE, SUTTON, and DONALD, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Richard J. Seryak, MILLER CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellant.  Stephen R. Drew, DREW, COOPER & ANDING, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Richard J. Seryak, Brian M. Schwartz, MILLER CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellant.  Stephen R. Drew, Adam C. Sturdivant, DREW, COOPER & ANDING, Grand Rapids, Michigan, for Appellee.  Paul D. Ramshaw, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

　　　MOORE, J., delivered the opinion of the court, which DONALD, J., joined. SUTTON, J. (pp. 30-33), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  While employed as an electrical line worker, Plaintiff-Appellee Theresa Waldo ("Waldo") was subjected routinely to sexual harassment.  Waldo's coworkers displayed sexually explicit materials in the workplace, locked her in a porta-potty, demanded that she "pee like a man" and clean up her male coworkers' tobacco spit, ridiculed her for bringing a purse to work, ostracized and ignored her on job sites and in training sessions, and referred to her using gender-specific demeaning language.  Waldo initiated litigation against her employer, Defendant-Appellant Consumers Energy Company ("Consumers"), bringing six federal and state-law discrimination claims, as well as a state-law tort claim.  Although a jury rendered a verdict in favor of Consumers following a trial in 2009, the district court granted Waldo's motion for a new trial on her Title VII hostile-work-environment claim, finding that the jury's verdict as to this claim was against the clear weight of the evidence.  After a second trial in 2010, the jury found in favor of Waldo, and the district court awarded Waldo attorney fees and costs as a prevailing plaintiff.  On appeal, Consumers contends that the district court erred by granting a new trial on Waldo's hostile-work-environment claim, denying Consumers's renewed motion for judgment as a matter of law after the second trial, and awarding Waldo excessive attorney fees and costs.  For the reasons that follow, we **AFFIRM** the judgment of the district court on all grounds.

# I. BACKGROUND

Waldo began working for Consumers in Grand Rapids, Michigan in 1997 as a part-time mail room clerk. R. 291 (1st Trial Tr. at 1719) (Page ID #6448).[1] In June 2001, Waldo transferred to the Transmission Department, which involved working in rural areas with electric lines containing high-voltage current attached to tall steel towers. Appellant Br. at 12–13. From September 2002 until June 2005, Waldo participated in an apprentice program that trained employees to become journeyman electrical workers. R. 291 (1st Trial Tr. at 1719–20) (Page ID #6448–49). Waldo alleges that from 2001 until 2005 she was subjected to "constant and unwelcome gender/sexual harassment" at Consumers. R. 1 (Compl. ¶ 10) (Page ID #4).

While working with the Transmission crews, Waldo testified that she constantly was called derogatory and demeaning names, including "bitch," "cunt," and "wench"; her coworkers would "just hammer [her] all day long," never referring to her by her real name. R. 297 (2nd Trial Tr. at 611–15) (Page ID #7162–66); *see id.* at 629 (Page ID #7180). While working in rural areas, where male crew members would urinate outdoors, Waldo testified that her coworkers would not permit her to use work trucks to travel to a nearby bathroom. *See id.* at 640–41 (Page ID #7191–92). Waldo says her male coworkers told her: "You want to work in a man's world, pee like a guy." *Id.* at 641 (Page ID #7192). Waldo also described an incident when her coworkers locked her in a trailer with instructions to clean up their tobacco-chew spit from the floor. *See id.* at 644–45 (Page ID #7195–96). On another day, Waldo's male coworkers locked her in a porta-potty—she escaped only after using a pocket knife to cut through the tape her coworkers had used to seal the door. *See id.* at 649–51 (Page ID #7200–02). Further, there were sometimes sexually explicit playing cards, calendars, and magazines in the work trucks. *See id.* at 671, 676 (Page ID #7222, 7227).

---

[1] The facts described here were testified to in two separate trials. Because the testimony was largely the same in both trials, we will describe the facts generally, interspersing citations to the records from both trials. The specific testimony and evidence relating to the grant of a new trial and the denial of judgment as a matter of law after the second trial will be considered and evaluated separately. *See infra* Parts II–III.

Waldo testified that on her first day of the apprentice training program, her supervisor, James McDonald ("McDonald"), told her that he intended to "wash [her] out" of the program because this was not a job for a woman, and he did not want women in the program. R. 283 (1st Trial Tr. at 202) (Page ID #4933). Waldo told the jury about an incident when her coworkers threw her purse out of the window of one of the trucks into the dirt and told her that "purses aren't allowed here in this type [of] work." R. 297 (2nd Trial Tr. at 615–17) (Page ID #7166–68). When Waldo tried to carry a smaller change purse in her pocket, the crew called her a "dike." *Id.* at 618 (Page ID #7169). Waldo often rode alone to the rural work sites, because male coworkers avoided traveling with her in order to prevent being teased about having sex with her. *See id.* at 622 (Page ID #7173).

In late 2002, Waldo began working mainly with Distribution crews, which involved "maintenance work performed on wooden utility poles supporting lower voltage lines such as those found in residential areas." Appellant Br. at 13. Waldo testified that her coworkers' hostility continued during her time working with Distribution crews. *See* R. 297 (1st Trial Tr. at 668–69) (Page ID #7219–20). Waldo's coworkers in Distribution isolated her and refused to work with her, making it clear that women were not welcome. *See id.* at 676–80 (Page ID #7227–31). There was also testimony concerning an incident on April 18, 2005, when Waldo was unexpectedly evaluated by members of the Apprentice Committee. Waldo made mistakes while she was climbing a pole during the evaluation, which led to her dismissal from the training program. Both Waldo and her coworker Michael Cutts ("Cutts") testified that they perceived this surprise evaluation to be motivated by gender and engineered to push Waldo out of the program. *See id.* at 683–89 (Page ID #7234–40); R. 284 (1st Trial Tr. at 413–16) (Page ID #5144–47). Consumers asserts that this was a routine visit by the Apprentice Committee to observe all of the trainees, and that Waldo's dismissal from the program was based on the severity of the mistakes she made. *See* Appellant Br. at 25–27.

Waldo complained numerous times about the harassment to her supervisor, McDonald, a union representative, and Human Resources ("HR") staff members Pam Bolden ("Bolden") and William Eckert ("Eckert"). *See, e.g.*, R. 295 (2nd Trial Tr. at 389–98) (Page ID #6941–50); *id.* at 214–19 (Page ID #6766–71); R. 298 (2nd Trial Tr. at 966–67) (Page ID #7517–18). In March 2003, Waldo had a meeting with members of Consumers's HR Department, including Bolden, in which she complained that she was being sexually harassed. However, Bolden testified that no formal investigation followed from this meeting, and that no formal reprimands were given to any of Waldo's coworkers or supervisors. *See* R. 294 (2nd Trial Tr. at 115) (Page ID #6666). Consumers did respond to Waldo's complaints by holding a "diversity training session," but that session did not lead to an end to the sexual harassment in Waldo's workplace. *See* Appellee Br. at 20–21. The diversity session covered "all aspects of diversity" but did not involve a discussion of the kinds of sexual slurs and sexual harassment about which Waldo complained. *See* R. 286 (1st Trial Tr. at 836–37) (Page ID #5566–67).

After Waldo was removed from the apprentice program in June 2005, this litigation commenced. Waldo brought seven claims, all centering around allegations that she was discriminated against and harassed because of her gender; the complaint included three Title VII claims (a sex-discrimination claim, a hostile-work-environment claim, and a retaliation claim), three state-law sex-discrimination claims, and a tort claim for intentional infliction of emotional distress. *See* R. 1 (Compl. at 8–15) (Page ID #9–16). Prior to trial, Waldo withdrew her claim for intentional infliction of emotional distress. Appellee Br. at 4 n.1. Before jury deliberations, she also withdrew her three state-law sex-discrimination claims. *Id.*

A trial was held in August and September 2009, and the jury rendered a verdict in favor of Consumers on the three remaining federal claims. *See* R. 191 (Judgment) (Page ID #3080). Waldo then filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59, arguing that the jury verdict on Waldo's retaliation and hostile-work-environment claims under Title VII was against the clear weight of the evidence. R. 197 (Pl.'s Mot. for New Trial at 2) (Page ID #3090). The district court denied the

motion as to Waldo's retaliation claim, but granted a new trial on the hostile-work-environment claim. *Waldo v. Consumers Energy Co.*, No. 1:06-cv-768, 2010 WL 2302305, at \*8 (W.D. Mich. June 4, 2010).

A second trial was held on the only remaining claim in 2010, and the jury rendered a verdict in favor of Waldo, awarding her $400,000 in compensatory damages and $7,500,000 in punitive damages. *See* R. 255 (Judgment) (Page ID #4125). The district court granted Consumers's motion to remit damages pursuant to a statutory cap, and lowered the total amount of damages recoverable by Waldo to $300,000. *Waldo v. Consumers Energy Co.*, No. 1:06-cv-768, 2011 WL 4529375, at \*8 (W.D. Mich. Sept. 30, 2011). Consumers filed a renewed motion for judgment as a matter of law pursuant to Rule 50(b), arguing that Waldo had not presented sufficient evidence to establish an actionable hostile work environment, and that she had not established a basis for holding Consumers liable for the harassing conduct of her coworkers. *See* R. 264 (Def.'s Renewed Mot. for J. as a Matter of Law at 5–6, 8–9) (Page ID #4245–46, 4248–49). The district court denied the motion after finding that there was sufficient evidence to support the verdict. *Waldo*, 2011 WL 4529375, at \*6.

Following the jury verdict in favor of Waldo in the second trial, Waldo filed a motion for attorney fees and costs under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000(e)(5)(k), and the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. *See* R. 259 (Pl.'s Mot. for Att'y Fees) (Page ID #4133). Waldo's counsel requested a rate of $400 per hour for lead counsel, Attorney Stephen Drew, and a rate of $200 per hour for associate counsel, Attorney Adam Sturdivant. *See id.* at 5 (Page ID #4138). Counsel sought fees for all of the time spent litigating Waldo's case on all claims and in both trials, requesting a total of $685,506.25 in attorney fees. *Id.* at 10 (Page ID #4143). Counsel also sought $38,879.05 for out-of-pocket costs and expert witness fees, including requests for reimbursement for a mock trial, jury-selection services, and photocopying. *See id.* at 9 (Page ID #4142). The district court granted Waldo's request for attorney fees and costs in full, except for five hours billed for Sturdivant's time for media relations. *Waldo v. Consumers Energy Co.*, No. 1:06-cv-

768, 2012 WL 1085190, at \*3–4, \*7 (W.D. Mich. Mar. 30, 2012).  Consumers timely appealed.  We have jurisdiction under 28 U.S.C. §§ 1291 and 1331.

## II.  GRANT OF NEW TRIAL

### A.  Standard of Review

We review for abuse of discretion a district court's grant of a motion for a new trial.  *See Holmes v. City of Massillon*, 78 F.3d 1041, 1045 (6th Cir. 1996).  This means that we will reverse the district court's decision "only if we have 'a definite and firm conviction that the trial court committed a clear error of judgment.'"  *Armisted v. State Farm Mut. Auto. Ins. Co.*, 675 F.3d 989, 995 (6th Cir. 2012) (quoting *Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*, 641 F.3d 240, 245–46 (6th Cir. 2011)).  A district court has discretion to grant a motion for a new trial if the court "determines that the verdict is clearly against the weight of the evidence."  *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007).  Nonetheless, "the court is not to set aside the verdict simply because it believes that another outcome is more justified."  *Id.*; *see Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967) (explaining that "[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable" (internal quotation marks omitted)).  If the verdict "was one which the jury reasonably could have reached," then a motion for a new trial should be denied.  *Armisted*, 675 F.3d at 995.  Accordingly, we "will overturn a grant of a motion for a new trial on the basis that the verdict was against the weight of the evidence where it is clear that the jury verdict was reasonable."  *Denhof*, 494 F.3d at 543.

### B.  Legal Principles

A work environment is actionable under Title VII if the workplace is "permeated with 'discriminatory intimidation, ridicule or insult' sufficiently severe or pervasive to alter the conditions of employment."  *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67

(1986)). A successful hostile-work-environment claim under Title VII requires a plaintiff to establish that

> (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [sex], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.[2]

*Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011).

"The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a mathematically precise test." *Hawkins*, 517 F.3d at 333 (internal quotation marks omitted). Courts must look at "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Under this totality-of-circumstances test, "the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations,

---

[2]The standards for holding an employer liable under Title VII differ depending on whether the hostile work environment was created by an employee's coworkers or by a supervisor. *See Vance v. Ball State Univ.*, 570 U.S. ___, 133 S. Ct. 2434, 2439 (2013). To recover against Consumers, Waldo was required to demonstrate a basis for employer liability based on *either* a supervisor's participation in the harassment that created the hostile work environment (subject to an affirmative defense), *or* Consumers's negligence in "discovering or remedying harassment by [Waldo's] coworkers." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). Although there was evidence at Waldo's trials relating to both supervisor and coworker harassment, we will focus on the testimony relating to Consumers's liability for the harassment by Waldo's coworkers, and affirm the district court's determinations on that basis. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). Accordingly, we need not address Consumers's liability for harassment by Waldo's supervisors. We nonetheless "consider harassment by all perpetrators combined" when determining the existence of a hostile work environment. *Id.*

and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

In a hostile-work-environment claim, the fifth element requires a plaintiff to demonstrate a basis for holding the employer liable for the harassing conduct of an employee's coworkers. The plaintiff must show that the employer's response to the plaintiff's complaints "manifest[ed] indifference or unreasonableness in light of the facts the employer knew or should have known." *Hawkins*, 517 F.3d at 338 (internal quotation marks omitted); *see Jackson v. Quanex Corp.*, 191 F.3d 647, 659 (6th Cir. 1999) (explaining that the plaintiff must show that the employer "tolerated or condoned the situation or that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action" (internal quotation marks omitted)). "Generally, a response is adequate if it is reasonably calculated to end the harassment." *Jackson*, 191 F.3d at 663. Steps that would "establish a base level of reasonably appropriate corrective action" may include promptly initiating an investigation to determine the factual basis for the complaint, "speaking with the specific individuals identified by [the complainant], following up with [the complainant] regarding whether the harassment was continuing, and reporting the harassment to others in management." *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 633 (6th Cir. 2010); *see also Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 686 (6th Cir. 2005).

**C. Application**

On appeal, Consumers argues that a reasonable jury could have found that Waldo failed to establish the elements of her hostile-work-environment claim because (i) a reasonable jury could have believed that the alleged harassment was not based on gender; (ii) a reasonable jury could have concluded that the challenged conduct was not severe or pervasive; (iii) a reasonable jury could have concluded that there was no basis to hold Consumers liable; and (iv) the district court erred by considering harassing behavior that occurred prior to March 12, 2005. We reject each of these arguments for the reasons that follow and conclude that the district court did not abuse its discretion in granting a new trial on Waldo's hostile-work-environment claim.

First, Consumers argues that a jury reasonably could have believed that Waldo was not subjected to harassment based on her gender, because some of the complained of incidents were not sexual, i.e., they did not consist of "physical conduct, touching or sexual advances." Appellant Br. at 37. This argument fails, because it construes too narrowly the types of conduct that can contribute to a work environment permeated with sexual harassment. We have held that "non-sexual conduct may be illegally sex-based where it evinces anti-female animus, and therefore could be found to have contributed significantly to the hostile environment." *Williams*, 187 F.3d at 565 (internal quotation marks omitted). Accordingly, "[*a*]*ny* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive . . . , constitute a hostile environment in violation of Title VII." *Id.*

Consumers attempts to isolate specific incidents which, considered apart from the context in which they occurred, do not appear to contain sexual connotations or gendered overtones. This approach fails, however, because "[f]acially neutral incidents may be included" in a hostile-work-environment analysis of the totality of the circumstances when there is "some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002). Here, the evidence regarding the use of gender-specific demeaning language, Waldo's lack of access to a bathroom, the incident involving Waldo's use of a purse on the work trucks, the sexually explicit magazines in the work trucks, and the ostracization of Waldo—the only woman working with her crews—provide a basis for inferring that even the facially neutral incidents were based on Waldo's gender.

Second, based on the totality of evidence presented at trial, it was not an abuse of discretion for the district court to find that the clear weight of the evidence established that Waldo was subjected to severe or pervasive harassment sufficient to create a hostile work environment. Consumers conceded that "Plaintiff's direct testimony [wa]s replete with allegations of a hostile work environment" violating Title VII's prohibitions.

R. 203-2 (Def.'s Br. in Opp. to Pl.'s Mot. for New Trial at 4) (Page ID #3356).  Waldo testified to the following incidents and behaviors, among others:

1.  There were sexually explicit magazines, calendars, and playing cards on the work trucks.  *See* R. 283 (1st Trial Tr. at 225–26) (Page ID #4956–57).

2.  Waldo repeatedly was called derogatory and demeaning names.  For example, she testified that a coworker named Eric yelled at her and called her a "bitch," *id.* at 208 (Page ID #4939), and that coworker Charlie Jacobs called her a "wench."  *Id.* at 215 (Page ID #4946).

3.  Waldo's coworkers threw her purse out of a work truck and into the dirt, telling her that "there were no purses allowed in these trucks." *Id.* at 238 (Page ID #4969).  When Waldo carried a smaller purse in her pocket instead, she was called a "dike."  *See id.* at 239 (Page ID #4970).

4.  Waldo's coworkers demeaned her by refusing to allow her to use work trucks to travel to a bathroom.  Instead, they told her:  "If I want to work in a man's world and I want to work a man's job, I got to pee like a man."  *Id.* at 234 (Page ID #4965).

5.  Waldo was locked inside a porta-potty after her coworkers taped it shut.  *Id.* at 257–59 (Page ID #4988–90).

6.  Her coworkers isolated her at work sites by excluding her from lunch trips, telling her to walk instead of riding with the rest of the all-male crew.  *Id.* at 237–38 (Page ID #4968–69).

7.  When Waldo entered Step IV of the apprentice program in 2005, her coworkers refused to speak to her or work with her.  R. 284 (1st Trial Tr. at 328–29) (Page ID #5059-60).

Much of the conduct testified to by Waldo either was confirmed by other witnesses, including defense witnesses, or was not directly controverted by other evidence.  For example, McDonald testified that there were sexually explicit magazines in the work trucks.  R. 288 (1st Trial Tr. at 1085–86) (Page ID #5815–16).  McDonald also testified that he was made aware of the porta-potty incident.  *Id.* at 1053 (Page ID #5783).  No one named Eric testified at trial and no witness refuted Waldo's allegation that Eric called her a "bitch."   Similarly, no one named Charlie testified to deny Waldo's allegation that Charlie called her a "wench," and McDonald testified that Charlie had

been "picking on Theresa" and that the two of them had been swearing at each other. *Id.* at 1054 (Page ID #5784). McDonald also acknowledged that he "vaguely" remembered Waldo complaining about being called sexually offensive names. *See* R. 287 (1st Trial Tr. at 1006) (Page ID #5736). Cutts testified that in Waldo's Step IV class, her male coworkers "didn't want her there" and refused to work with her. R. 284 (1st Trial Tr. at 405–06) (Page ID #5136–37). One of Waldo's instructors, Jeffrey Barnes ("Barnes"), testified that he reprimanded one of Waldo's coworkers for making anti-female comments and for refusing to work with her. R. 289 (1st Trial Tr. at 1349–51) (Page ID #6079–81). Jack Huizinga, the union representative, testified that in March 2003 Waldo complained to him that she was being discriminated against because she was a woman, including, for example, being called names. R. 290 (1st Trial Tr. at 1512) (Page ID #6241). Based on the totality of evidence presented to the jury, the district court did not abuse its discretion in finding that the clear weight of the evidence demonstrated that Waldo's working environment at Consumers was filled with discriminatory intimidation, ridicule, and insult that was sufficient to alter the conditions of her employment and thus be actionable under Title VII. *See Hawkins*, 517 F.3d at 333; *Waldo*, 2010 WL 2302305, at *5.

Third, it was not an abuse of discretion for the district court to find that the clear weight of the evidence established that Consumers could be held liable for the harassing behavior of Waldo's coworkers. Based on the witness testimony, no reasonable jury could have found that Consumers was not aware of the harassment. Waldo testified that she brought the harassing behavior to McDonald's and other supervisors' attention on several occasions. *See, e.g.*, R. 283 (1st Trial Tr. at 221–22) (Page ID #4952–53). McDonald acknowledged that Waldo had complained to him numerous times about the demeaning name-calling and unfair treatment. R. 287 (1st Trial Tr. at 1006–07) (Page ID #5736–37). Consumers's HR representatives similarly testified that they were aware of Waldo's complaints regarding the harassment and had spoken with Waldo several times about her complaints. R. 286 (1st Trial Tr. at 690–92) (Page ID #5420–22); *id.* at 812 (Page ID #5542). After Waldo filed a grievance with the union, she had a meeting

in March 2003 with union representatives and HR staff to discuss her complaints about the working environment. *See id.* at 811 (Page ID #5541).

Additionally, it was not an abuse of discretion to find that the clear weight of the evidence demonstrated that Consumers's response to the complaints of harassment was inadequate. Consumers's HR representatives testified that despite being aware of the allegations of sex harassment, no formal investigation was undertaken. None of Waldo's coworkers were interviewed in an effort to determine whether the complaints were valid or who was responsible for the mistreatment. *See id.* at 822 (Page ID #5552); *id.* at 694 (Page ID #5424). McDonald testified that although Waldo complained to him several times, he did not report several of the specific complaints of gender-based harassment to anyone in upper management. R. 287 (1st Trial Tr. at 1006–08) (Page ID #5736–38).

It was the clear testimony of the HR witnesses that Consumers was aware of Waldo's complaints, but that no formal response or investigation was undertaken; this was contrary to Consumers's policies, which promise that "[c]omplaints will be fully investigated." R. 327-4 (Joint Trial Ex. 50 at 25, Code of Conduct) (Page ID #8755). This failure to respond to known complaints demonstrated that Consumers tolerated or condoned the harassing behavior, or, at the very least, that the company failed to take appropriate remedial action. *See Jackson*, 191 F.3d at 663–64 (holding that when the employer knew about complaints but "made no effort to discover the perpetrators" of harassment, the employer's response was not reasonably calculated to end the harassment); *Waldo*, 2010 WL 2302305, at *6 ("[Waldo's] complaints, from a legal standpoint, warranted a response well beyond that provided by Defendant, which essentially was an ineffective and unmonitored attempt at employee diversity training or sporadic reactions."). Accordingly, it was not an abuse of discretion for the district court to conclude that the clear weight of the evidence established a basis for holding Consumers liable for the hostile work environment.

Finally, the district court properly considered evidence regarding the full span of harassing behavior, even the conduct that occurred prior to March 12, 2005. Title VII requires that employees file a charge with the EEOC within 300 days of an alleged

unlawful employment practice.  *See* 42 U.S.C. § 2000e-5(e)(1).  The Supreme Court has held that a hostile work environment that violates Title VII "occurs over a series of days or perhaps years . . . . Such claims are based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).  Accordingly, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117; *see Jordan v. City of Cleveland*, 464 F.3d 584, 596–97 n.17 (6th Cir. 2006).

It was not an abuse of discretion for the district court to find that the clear weight of the evidence demonstrated ongoing isolation and an atmosphere of hostility towards Waldo, and that this atmosphere continued into 2005, when Waldo participated in the Step IV class.  There was testimony from both Waldo and Cutts that Waldo's coworkers ignored her and refused to speak with her during her Step IV class in 2005.  *See* R. 284 (1st Trial Tr. at 328) (Page ID #5059); *id.* at 333 (Page ID #5064); *id.* at 405–06, 409 (Page ID #5136–37, 5140).  Barnes, one of Waldo's instructors in 2005, further corroborated this testimony when he stated that he reprimanded one of Waldo's coworkers for making comments that he did not want to work with women and that women were not strong enough to do the job.  R. 289 (1st Trial Tr. at 1349–50) (Page ID #6079–80).  Defense witness Joseph Mondrella, another member of Waldo's Step IV class, did not have knowledge of whether others made anti-female statements, and he did not directly dispute the testimony regarding the isolation of Waldo.  *See* R. 289 (1st Trial Tr. at 1316–21) (Page ID #6046–51).  This type of conduct—ignoring and ostracizing a coworker—if motivated by gender-based animus, can be a form of gender-based harassment that contributes to a hostile work environment.  *See Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001) (explaining that sex harassment "may include ridicule, ostracism, and other forms of hostility motivated by anti-female animus"); *O'Rourke v. City of Providence*, 235 F.3d 713, 729–30 (1st Cir. 2001) (holding that "exclusion," "denial of support," and coworkers' "silent treatment" can be considered as part of a hostile-work-environment claim); *Williams*, 187 F.3d at 565–66 (holding that ostracization motivated by gender-based animus can contribute to a hostile work

environment). Because there was strong evidence that Waldo continued to face hostility and isolation in April 2005, the district court acted within its discretion by finding that the clear weight of the evidence demonstrated that at least one incident of harassing behavior contributing to the hostile environment occurred after March 12, 2005. Thus all of the relevant harassment could be considered.[3]

In sum, given the full scope of the evidence presented at the first trial, we hold that it was not an abuse of discretion for the district court to grant a new trial on Waldo's hostile-work-environment claim.

## III.  DENIAL OF RENEWED MOTION FOR JUDGMENT
## AS A MATTER OF LAW

### A.  Standard of Review

Consumers argues that the district court erred by denying its motion for judgment as a matter of law following the second trial on Waldo's hostile-work-environment claim. We review de novo the decision of a district court on a motion for judgment as a matter of law, applying the same standard used by the district court. *See Parker v. Gen. Extrusions, Inc.*, 491 F.3d 596, 602 (6th Cir. 2007). In evaluating a motion for judgment as a matter of law and deciding whether there was sufficient evidence to support the jury's verdict,

> "[t]he evidence should not be weighed, and the credibility of the witnesses should not be questioned. The judgment of this court should not be substituted for that of the jury; instead, the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences."

*Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 531 (6th Cir. 2005) (quoting *Williams v. Nashville Network*, 132 F.3d 1123, 1130–31 (6th Cir. 1997)). A motion for judgment as a matter of law should be granted only if "there is no genuine issue of material fact

---

[3]Despite Consumers's argument to the contrary, *see* Appellant Br. at 45–46, this conclusion follows even assuming that the jury reasonably could have believed that the April 18, 2005 incident was not motivated by gender-based animus. Excluding the April 18, 2005 surprise evaluation, there was still testimony regarding harassment after March 12, 2005, specifically testimony, corroborated by multiple witnesses, that Waldo continued to be ignored and ostracized in her Step IV class in April 2005.

for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005).

**B. Analysis**

As stated previously, in order to find in favor of Waldo on her hostile-work-environment claim, the jury had to find, by a preponderance of the evidence, that: "(1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [sex], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams*, 643 F.3d at 511. On appeal, Consumers argues that Waldo failed to present sufficient evidence of the fourth and fifth elements of her hostile-work-environment claim. Namely, Consumers contends that Waldo failed to present evidence of severe or pervasive harassment within 300 days of when she filed her EEOC charge, and that Waldo did not present evidence that Consumers failed to take appropriate remedial action in response to Waldo's complaints of coworker harassment. Upon review of the record in the second trial, we hold that the district court did not err by denying Consumers's motion for judgment as a matter of law: there was sufficient evidence presented such that a reasonable jury could find in favor of Waldo on her hostile-work-environment claim.

First, there was ample evidence that Waldo was subjected to severe or pervasive harassment sufficient to be actionable under Title VII. Waldo testified regarding a wide range of harassing behaviors that she endured on a regular basis at work, where she was the first woman to work with the Transmission Department. R. 296 (2nd Trial Tr. at 421) (Page ID #6973). Waldo testified that McDonald told her that there would "never . . . be women in [the Transmission Department]," and that if she took the job, she would be "wash[ed] . . . out" of the program. R. 296 (2nd Trial Tr. at 598) (Page ID #7150). There was also testimony about constant demeaning name-calling, *see* R. 297 (2nd Trial Tr. at 611–12) (Page ID #7162–63), the incident when Waldo was locked in a porta-potty, *see id.* at 647–51 (Page ID #7198–202), and the presence of sexually explicit

materials in the trucks of both the Distribution and Transmission crews. *See id.* at 671, 676 (Page ID #7222, 7227). Waldo repeated her testimony from the first trial regarding her lack of access to bathrooms at rural job sites, and that her coworkers ridiculed her for bringing a purse to work. *See id.* at 641 (Page ID #7192); *id.* at 617–18 (Page ID #7168–69). While her male coworkers went with McDonald for an ice cream break on a hot day, Waldo testified that she was told to stay behind and do extra shoveling, and that this task was assigned "[j]ust to break [her]." *Id.* at 619–21 (Page ID #7170–72). Waldo explained that she was isolated when riding to work sites: her male coworkers avoided riding with her because if they did, they "would have to take the hazing of [being told] you were having sex with [Waldo]." *Id.* at 622–23 (Page ID #7173–74).

Other witnesses corroborated Waldo's testimony regarding the harassment. Larry Lyle, an instructor at Consumers, testified that he was told not to help Waldo during training sessions, and that he had heard McDonald using derogatory language to refer to women. R. 296 (2nd Trial Tr. at 519–21) (Page ID #7071–73). McDonald acknowledged that Waldo complained to him regarding the offensive name-calling. R. 295 (2nd Trial Tr. at 389) (Page ID #6941). Huizinga also testified that Waldo had told him that she was being harassed by her male coworkers. R. 298 (2nd Trial Tr. at 937) (Page ID #7488). A reasonable jury could have found this testimony credible and could have found that Waldo's workplace was "permeated with discriminatory intimidation, ridicule, and insult . . . that [wa]s sufficiently severe or pervasive to alter the conditions of [Waldo's] employment." *Harris*, 510 U.S. at 21 (internal quotation marks omitted); *see Williams*, 187 F.3d at 559, 562–64 (holding that the combination of "humiliating and fundamentally offensive" name-calling, offensive remarks directed at women generally, office "pranks" including "being locked in one's work area," being denied breaks, and being ostracized constituted sufficiently severe and pervasive harassment to be actionable under Title VII).

Second, Consumers argues that no evidence was presented regarding unlawful conduct within the 300-day period prior to when Waldo filed her charge with the EEOC, and that for this reason her hostile-work-environment claim must fail. *See* Appellant Br.

at 48.  As explained in Part II *supra*, as long as at least one act contributing to the hostile-work-environment claim occurred within the filing period, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Morgan*, 536 U.S. at 117.  Contrary to Consumers's assertions, there was evidence presented that Waldo was subjected to harassing behavior after March 12, 2005.  Waldo testified that in April 2005, during her Step IV training, her coworkers refused to work with her and one coworker stated that "women shouldn't be in this job." R. 297 (2nd Trial Tr. at 677–80) (Page ID #7228–31).  Cutts confirmed Waldo's account when he testified that in the Step IV class in 2005, Waldo's coworkers ostracized her, isolated her, and made it clear that they resented her presence.  R. 294 (2nd Trial Tr. at 146–47) (Page ID #6697–98).  A reasonable jury could have inferred that this isolation and ostracization was motivated by gender-based animus and thus contributed to the hostile work environment.  *See Berry*, 260 F.3d at 811; *Williams*, 187 F.3d at 565–66. Additionally, a reasonable jury could have found credible Waldo and Cutts's testimony that the unexpected evaluation on April 18, 2005, was motivated by gender-based animus.  *See* R. 294 (2nd Trial Tr. at 154–56) (Page ID #6705–07) (indicating that Cutts perceived the evaluation as intended "to X [Waldo] out of the program"); R. 297 (2nd Trial Tr. at 683–89) (Page ID #7234–40).  From this evidence, a jury reasonably could have believed that harassing acts contributing to the hostile work environment occurred after March 12, 2005.

Third, on the evidence presented, a reasonable jury could have found that there was a basis for holding Consumers liable for the harassing conduct of Waldo's coworkers.  As in the first trial, McDonald testified that Waldo complained to him several times about harassment, including derogatory name-calling and the porta-potty incident.  *See* R. 295 (2nd Trial Tr. at 389–97) (Page ID #6941–49); R. 296 (2nd Trial Tr. at 498) (Page ID #7050).  However, no formal action was taken, i.e., McDonald did not create a written record of the complaints or formally reprimand any of Waldo's coworkers.  R. 295 (2nd Trial Tr. at 389–97) (Page ID #6941–49).  Additionally, HR representatives Bolden and Eckert testified that they were aware of Waldo's complaints about gender-based harassment, but that no formal investigations or interviews were

undertaken. *See id.* at 214–17 (Page ID #6766–69); *id.* at 298–300 (Page ID #6850–52); R. 294 (2nd Trial Tr. at 115) (Page ID #6666); R. 298 (2nd Trial Tr. at 967) (Page ID #7518). Although a response plan was formulated that involved a one-day diversity training session, the plan's contemplated action of long-term monitoring and follow-up was never implemented. *See* R. 295 (2nd Trial Tr. at 308–10) (Page ID #6860–62). From this testimony, a reasonable jury could have found that Consumers knew about the harassing behavior but failed to take reasonable remedial steps. *See Williams*, 643 F.3d at 511. Accordingly, it was reasonable for the jury to find that Consumers manifested indifference towards the harassment, and thus could be held liable under Title VII. *See Jackson*, 191 F.3d at 659.

In sum, a reasonable jury could have found that Waldo met her burden of proof to show that she was subjected to severe or pervasive sexual harassment creating a hostile work environment and that Consumers could be held liable for the hostile environment. As a result, the district court did not err by denying Consumers's motion for judgment as a matter of law.

## IV. ATTORNEY FEES AND COSTS

### A. Standard of Review

We review for abuse of discretion the district court's award of attorney fees and costs to a prevailing party under 42 U.S.C. § 1988. *Dubay v. Wells*, 506 F.3d 422, 431 (6th Cir. 2007). "'Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment.'" *Revis v. Meldrum*, 489 F.3d 273, 280 (6th Cir. 2007) (quoting *Berger v. City of Mayfield Heights*, 265 F.3d 399, 402 (6th Cir. 2001)); *see also DiLaura v. Twp. of Ann Arbor*, 471 F.3d 666, 671 (6th Cir. 2006) ("Abuse of discretion exists only when a district court relies upon clearly erroneous factual findings, applies the law improperly, or uses an erroneous legal standard." (internal quotation marks omitted)). Further, "[i]n light of a district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters, an award of attorneys' fees under § 1988 is

entitled to substantial deference." *Wilson-Simmons v. Lake Cnty. Sheriff's Dep't*, 207 F.3d 818, 823 (6th Cir. 2000) (internal quotation marks omitted).

In this case, Consumers challenges the district court's determination of a reasonable hourly rate for lead counsel, the court's failure to reduce the fee award in light of the fact that Waldo succeeded on only some of her claims, the court's determination that Waldo was entitled to attorney fees in connection with her first trial, and the court's determination that Waldo was entitled to all of the costs she requested. We address each of these arguments in turn.

**B.  Hourly Rate for Attorney Drew**

Consumers argues that the district court abused its discretion in finding that $400 per hour was a reasonable rate for Attorney Drew. *See* Appellant Br. at 56. When making a determination of a reasonable attorney fee, a district court begins by determining "the fee applicant's 'lodestar,' which is the proven number of hours reasonably expended on the case by an attorney, multiplied by his court-ascertained reasonable hourly rate." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000). We have explained that "[a] district court has broad discretion to determine what constitutes a reasonable hourly rate for an attorney." *Wayne v. Vill. of Sebring*, 36 F.3d 517, 533 (6th Cir. 1994). "A trial court, in calculating the 'reasonable hourly rate' component of the lodestar computation, should initially assess the '*prevailing market rate in the relevant community*.'" *Adcock-Ladd*, 227 F.3d at 350 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). The prevailing market rate is "that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Id.* A district court is permitted to "rely on a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests." *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 499 (6th Cir. 2011); *see Dowling v. Litton Loan Servicing LP*, 320 F. App'x 442, 447 (6th Cir. 2009) (affirming a district court's calculation of a reasonable hourly rate based on the court's "knowledge of local billing practices" and counsel's customary billing rates).

Here, the district court provided "a concise but clear explanation of its reasons for the fee award." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). The district court found that lead counsel "is a highly respected, experienced and accomplished practitioner in civil rights and employment litigation, and without question, exceptional in his background and skills." *Waldo*, 2012 WL 1085190, at *4. The district court permissibly considered fee awards in other cases in the Western District of Michigan, the rates for experienced attorneys in the Grand Rapids area as reflected in the State Bar of Michigan 2010 Survey, and the court's "familiarity with the market rates for legal services in th[e] community." *Id.* at *3–4; *see* R. 317-8 (Br. in Opp. to Pl.'s Mot. for Att'y Fees and Costs, Ex. 8, at 7) (Page ID #8569) (stating that hourly billing rates in Grand Rapids were as high as $420 per hour in 2010). The court accordingly approved lead counsel's requested hourly rate of $400. *Waldo*, 2012 WL 1085190, at *3. Although the reasonable hourly rate determined by the district court is on the high end, we find no abuse of discretion in the court's finding that the rate of $400 per hour was "justified and reasonable based on the rate that lawyers of comparable skill and experience could reasonably expect to command within this venue." *Id.* at *3; *see Glover v. Johnson*, 934 F.2d 703, 716 (6th Cir. 1991) (holding that there was no abuse of discretion when a district court awarded an hourly rate higher than the median rate, when the district court "found that counsels' qualifications, experience, and skill" in the relevant practice area merited a higher rate). The district court considered appropriate factors in its analysis, and its determination of a reasonable hourly rate is not outside the range of reported rates for highly experienced attorneys in the area. Thus, we conclude that the district court's determination of the reasonable hourly rate for lead counsel was within its discretion.

## C. Reduction in Fees

Consumers next argues that Waldo's fee award should have been reduced based on her partial success, because she succeeded on only one of the seven claims asserted in her complaint. *See* Appellant Br. at 49–50. We are not persuaded that the district court abused its discretion in declining to reduce the fee award. The Supreme Court has

instructed that "the most critical factor" governing the reasonableness of a fee award "is the degree of success obtained." *Hensley*, 461 U.S. at 436. In cases when "a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id.* at 435. Accordingly, we have explained that "a reduction in attorney fees [awarded to a prevailing plaintiff] is to be applied only in rare and exceptional cases where specific evidence in the record requires it." *Isabel v City of Memphis*, 404 F.3d 404, 416 (6th Cir. 2005). Specifically, a court should not measure a plaintiff's success simply by using a ratio of successful claims to claims raised. *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 421 F.3d 417, 423 (6th Cir. 2005). Indeed, "[w]e have 'repeatedly rejected mechanical reductions in fees based on the number of issues on which a plaintiff has prevailed.'" *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 554 (6th Cir. 2008) (quoting *Deja Vu*, 421 F.3d at 423). Instead, "[w]hen claims are based on a common core of facts or are based on related legal theories, for the purpose of calculating attorney fees they should not be treated as distinct claims, and the cost of litigating the related claims should not be reduced." *Deja Vu*, 421 F.3d at 423 (internal quotation marks omitted). This is because when several claims arise from a common core of facts, "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims." *Hensley*, 461 U.S. at 435.

In this case, the district court did not abuse its discretion in finding that all of Waldo's claims were related and involved a common core of facts. *See Waldo*, 2012 WL 1085190, at *5. We agree with the district court that all of Waldo's claims focused on the same series of incidents demonstrating the ways in which her coworkers subjected her to sexual harassment. The district court found that the evidence gathered through the twenty-five depositions taken in the case as well as "extensive written discovery . . . . related to all three claims of sexual harassment/hostile work environment, discrimination, and retaliation." *Id.* at *5. The district court further explained:

> Although Plaintiff did not prevail on her discrimination and retaliation
> claims, the Court *cannot emphasize enough* that Plaintiff's successful

> sexual harassment/hostile work environment claim shared a common core of facts with all the asserted claims from the beginning to the conclusion of this case. The discrimination, hostile work environment, and retaliation claims presented in this case were closely intertwined; they involved essentially the same underlying facts and evidence; and all pertained to Plaintiff's ultimate claim concerning a hostile work environment, which was the basis for the damages awarded.

*Id.*

We agree that all of the evidence presented concerning the discriminatory treatment of Waldo in the workplace, as well as evidence of retaliation for Waldo's complaints of harassment, related to the hostility Waldo faced at Consumers because of her gender. We previously have concluded that harassment, discrimination, and hostile-work-environment claims are related for purposes of attorney fees, and have reversed as an abuse of discretion a district court's reduction of fees based on a plaintiff's success on only some of several interrelated Title VII claims. *See Jordan*, 464 F.3d at 603–04. In *Jordan*, because there was a "significant legal overlap" between claims of racial discrimination, harassment, and retaliation, we held that under *Hensley* the plaintiff was entitled to "a full recovery for counsel's services, rather than a percentage reduction," even though he succeeded on only some of his claims. *See id.* We explained the reason why a full recovery was warranted as follows:

> [L]itigation is not an 'exact science': Lawyers cannot preordain which claims will carry the day and which will be treated less favorably. Good lawyering as well as ethical compliance often requires lawyers to plead in the alternative. Fee awards comport with that reality by giving full credit to a meaningfully successful plaintiff, rather than making a mechanical per-losing-claim deduction from an attorney's fee award.

*Id.* at 604 (citations omitted).[4] Accordingly, we have repeatedly upheld a district court's refusal to reduce an attorney fee award when a plaintiff prevails on only some of his or

---

[4] In our view, unlike that of the dissent, Waldo was just as much a "meaningfully successful plaintiff" as was Jordan. *Jordan*, 464 F.3d at 604. Waldo, like Jordan, succeeded on a significant issue in her litigation, and she achieved substantial overall relief—a $7.9 million jury verdict, later reduced to the statutory cap of $300,000. Because all of the employment-discrimination claims in their respective cases arose out of a common core of facts, their lawsuits "cannot be viewed as . . . series of discrete claims." *Hensley*, 461 U.S. at 435. Accordingly, a fully compensatory attorney fee was within the district court's discretion to award.

her related anti-discrimination causes of action, and our sister circuits have done the same. *See, e.g.*, *Imwalle*, 515 F.3d at 554–56 (upholding full attorney fee award when plaintiff succeeded on only three of nine claims); *Isabel*, 404 F.3d at 416 (rejecting argument that fee award should be reduced because plaintiffs lost three out of their four claims); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1169–70 (6th Cir. 1996); *see also Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1111 (10th Cir. 1998); *Dunning v. Simmons Airlines, Inc.*, 62 F.3d 863, 873–74 (7th Cir. 1995).

Further, a full recovery was permissible because Waldo "obtained excellent results." *Hensley*, 461 U.S. at 435. She sought damages and received $300,000, the maximum award possible under Title VII (the jury thought she deserved $7,900,000).[5] *See* 42 U.S.C. § 1981a(b)(3)(D); R. 255 (Judgment) (Page ID #4125). Waldo succeeded on a significant and central issue in the litigation, namely that she was subjected to a hostile work environment at Consumers because of her gender. She thus succeeded in "remedying a civil rights violation" and "serv[ed] as a private attorney general, vindicating a policy that Congress considered of the highest priority." *Fox v. Vice*, 131 S. Ct. 2205, 2213 (2011) (internal quotation marks omitted). The district court acted within its discretion in finding that Waldo's attorneys should receive a fully compensatory fee for this excellent result. *See id.* ("Fee shifting in [a successful civil rights] case at once reimburses a plaintiff for what it cost him to vindicate civil rights, and holds to account a violator of federal law." (internal quotation marks, citations, and

---

[5]Although the dissent insinuates that the attorney fee award was unreasonable because it was slightly more than twice as much as the damages award to Waldo, *see* Dissent at 30, 32, "[i]n the civil rights area, there is no requirement that the amount of an award of attorneys' fees be proportional to the amount of the underlying award of damages." *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995); *see City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986) (plurality op.). In *City of Riverside*, the Supreme Court upheld an attorney fee award that was more than seven times greater than the damages awarded to plaintiffs. We similarly have affirmed an attorney fee award that was more than five times the damages awarded to a plaintiff in a civil rights case, stating that "the value of the rights vindicated goes beyond the actual monetary award, and the amount of the actual award is not controlling." *McHenry v. Chadwick*, 896 F.2d 184, 189 (6th Cir. 1990). As the Supreme Court explained in *City of Riverside*: "Congress enacted § 1988 specifically because it found that the private market for legal services failed to provide many victims of civil rights violations with effective access to the judicial process. . . . In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case." 477 U.S. at 576, 578. Notwithstanding the dissent's apparent displeasure with Congress's chosen policy, our precedents establish that an attorney fee award in a civil rights case is not unreasonable merely because it is greater than the damages awarded to the plaintiff.

alterations omitted)).  Accordingly, the district court's refusal to reduce the fee award because Waldo succeeded on only one of her claims was permissible.

We are not persuaded by the dissent's contention that it was an abuse of discretion for the district court to refuse to reduce Waldo's fee award because the jury found in her favor on only the hostile-work-environment claim.  The dissent's emphasis and reemphasis on the fraction of claims in Waldo's complaint on which her damages award was based—the dissent's spin on Waldo's success as "*los*[*ing*] the first jury trial" and "*los*[*ing*] six of the seven claims," Dissent at 30 (emphasis in original)—runs contrary to our clear precedents holding that a fee award may not be reduced based on a ratio of claims brought to claims won.  As we held in *DiLaura* when we reversed a district court's reduction in attorney fees, "[b]y focusing on the fact that most of the plaintiffs' claims failed . . . [a court] does what *Hensley* specifically forbids:  it analyzes a series of related legal claims based on a common core of facts, and determines the amount of fees, not based on the plaintiffs' overall success, but based on the success or failure of the individual claims." *DiLaura*, 471 F.3d at 673.  The dissent's argument that Waldo was only minimally successful ignores the reality that Waldo's attorneys achieved an excellent result for their client.  Waldo's complaint sought "all appropriate damages" arising out of the unlawful employment practices at Consumers, *see* R. 1 (Compl. ¶ 65) (Page ID #17), and the jury awarded Waldo $7,900,000 (later remitted to $300,000 pursuant to a statutory cap).  Given this excellent result, a fully compensatory attorney fee award was appropriate. *See Hensley*, 461 U.S. at 435 (holding that when "a plaintiff has obtained excellent results, . . . . the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit"); *Isabel*, 404 F.3d at 416 ("A proffer of alternative arguments does not justify reducing an award, especially where the arguments were made on a common set of facts and success on just one of the arguments would achieve the hoped-for results.").

Additionally, we reject the dissent's assertion that the work done litigating this case would have been cleanly divisible between the claims.  The legal standards governing Waldo's Title VII claims and her corresponding state-law claims under the

Elliott-Larsen Civil Rights Act (ELCRA) are nearly identical. *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012) (hostile work environment); *id.* at 472 (retaliation); *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652–53 (6th Cir. 2012) (discrimination). Accordingly, it would be "difficult to divide the hours expended on a claim-by-claim basis" as between the federal and state-law claims. *Hensley*, 461 U.S. at 435. Further, "[t]his court has in fact held that discrimination and retaliation claims are related for the purpose of awarding attorney fees." *Imwalle*, 515 F.3d at 555. Here, as in *Imwalle*, "there [wa]s a significant overlap in the legal theories" underlying Waldo's discrimination, retaliation, and hostile-work-environment claims. *Id.* The Supreme Court in *Hensley* held that "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." *Hensley*, 461 U.S. at 435.[6] As we have explained, we have routinely concluded that these types of claims are interrelated, and have affirmed district courts' decisions to compensate successful plaintiffs for work done on all of the claims, even when only some are ultimately successful.

Contrary to Consumers's contention, *see* Appellant Br. at 51, it also was not an abuse of discretion for the district court to award Waldo fees relating to the first trial. "[T]he question of whether a party 'prevailed' and whether a fee award is 'reasonable' is not one to parse too thinly . . . [based on] the number of trials required to reach a result." *Abner v. Kan. City S. Ry. Co.*, 541 F.3d 372, 382 (5th Cir. 2008). Accordingly, "so long as a plaintiff's actions are not responsible for the need for a second trial, the plaintiff may be compensated for time spent on both proceedings." *Shott v. Rush-*

---

[6]The dissent's citation to *Hensley* as a "spot-on comparison" in this regard is also off the mark. The *Hensley* Court explained that if a plaintiff challenged several factually unrelated institutional practices and conditions—for example, the physical environment of buildings in a state hospital, the hospital's visitation, telephone and mail policies, and its alleged policy of giving patients excessive medication, *see* 461 U.S. at 427 n.1—success on only one of those claims would not warrant recovery of attorney fees for time spent litigating all of the claims. *Id.* at 436. This was not the situation presented by the instant case. Waldo challenged a single, factually unified unlawful employment practice at Consumers: its discriminatory treatment and harassment of female employees. Although Waldo sought relief through several "alternative legal grounds," all of those grounds arose out of a "common core of facts." *Id.* at 435. Accordingly, Waldo's fee award should not be reduced because Waldo's success was based on only one of those "related legal theories." *Id.*

*Presbyterian-St. Luke's Med. Ctr.*, 338 F.3d 736, 740 (7th Cir. 2003).**[7]** The First, Second, Fifth, Seventh, and Tenth Circuits have all permitted attorney fees to be awarded for multiple trials, so long as "the plaintiff's unreasonable behavior did not cause" the need for multiple proceedings and as long as counsel's time was reasonably expended. *Abner*, 541 F.3d at 381–82; *see Flitton v. Primary Residential Mortg., Inc.*, 614 F.3d 1173, 1177 (10th Cir. 2010); *O'Rourke*, 235 F.3d at 737; *Gierlinger v. Gleason*, 160 F.3d 858, 877–78 (2d Cir. 1998); *Jaffee v. Redmond*, 142 F.3d 409, 416 (7th Cir. 1998). Here, the hours spent litigating the first trial were reasonably expended to achieve a positive result for Waldo, and the need for a second trial was not created by any unreasonable missteps by Waldo or her attorneys. Accordingly, the district court could, in its discretion, award fees for the first trial.

The dissent attempts to distinguish these cases, arguing that Waldo should be denied fees for the first trial because her counsel was to blame for the granting of the new trial. *See* Dissent at 31. We cannot agree that Waldo's counsel behaved unreasonably or made mistakes that created the need for a second trial. Faulting Waldo's counsel in these circumstances reflects a misunderstanding of the nature of a Rule 59 motion. A Rule 59 motion is not, as the dissent suggests, a means of achieving a "do-over" in the case of poor performance by counsel. Instead, it preserves the trial judge's authority to prevent a jury verdict from standing when, in the district court's view, the jury's verdict was against the clear weight of the evidence and a new trial is necessary to "prevent a miscarriage of justice." *Holmes*, 78 F.3d at 1047. Rule 59 thus preserves the trial judge's power to "provide[] substantial protection against th[e] risk" that "jury prejudice may deprive a victim of discrimination of the verdict to which he or she is entitled." *Curtis v. Loether*, 415 U.S. 189, 198 (1974). The dissent joins our view of the evidence in the first trial and agrees that it was not an abuse of discretion for the district court to find that the first jury's verdict was against the clear weight of the

---

**[7]**The dissent points out that the Seventh Circuit in *Shott* rejected the claim for fees for multiple trials. It fails to mention, however, that the reason the claim for fees was rejected there was that the plaintiff's counsel was responsible for the need for multiple trials—a circumstance not present in this case, as explained *infra*. *See Shott*, 338 F.3d at 741.

evidence. *See Denhof*, 494 F.3d at 543. The dissent's contention that Waldo's counsel should be penalized for marshaling such a strong case on behalf of Waldo is baffling.

**D. Award for Costs**

Consumers asserts that the district court erred by awarding Waldo all of her requested costs, arguing that costs for focus groups, mock trials, jury-selection services, and mediation are non-recoverable, and that Waldo did not provide sufficient documentation regarding the reasonableness of the costs requested. *See* Appellant Br. at 60. Like an award of attorney fees, a district court's award of costs under § 1988 is reviewed for an abuse of discretion. *NE Ohio Coal. for the Homeless v. Sec'y of State*, 695 F.3d 563, 569 (6th Cir. 2012). "The award of statutory costs is a matter for the district court, in its best judgment as to what was reasonable and necessary, and the appellate courts will not normally interfere with the exercise of that discretion." *Sigley v. Kuhn*, 205 F.3d 1341, 2000 WL 145187, at *8 (6th Cir. 2000).

Section 1988 permits district courts to award those "'incidental and necessary expenses incurred in furnishing effective and competent representation'" as part of the award of attorney fees. *Id.* at *9 (quoting *Northcross v. Bd. of Educ. of Memphis City Sch.*, 611 F.2d 624, 639 (6th Cir. 1979)). Recoverable out-of-pocket expenses are those "incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services," such as "[r]easonable photocopying, paralegal expenses, and travel and telephone costs." *Northcross*, 611 F.2d at 639. Here, the district court acted within its discretion in finding that Waldo's requested costs for focus groups, mock trials, jury-selection services, and mediation were reasonable and necessary to provide Waldo with effective representation, because such services "conferred a benefit to the prevailing party by helping to produce a favorable result." *See Sigley*, 2000 WL 145187, at *9. The photocopying and telephone expenses also were awarded reasonably in the district court's discretion. Accordingly, we affirm the district court's award of costs to Waldo.

## V. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

## CONCURRING IN PART, DISSENTING IN PART

---

SUTTON, Circuit Judge, concurring in part and dissenting in part. I join all sections of the majority's opinion save one: its decision to uphold the district court's award of $684,506 in attorney's fees—all but $1,000 of the fees requested by Waldo's attorney without any additional reduction for time or rate, including for all work incurred to *lose* the first jury trial, all work incurred to *lose* six of the seven claims (four of them state law claims) and for all work incurred to win *$300,000* in the second jury trial. One can be forgiven for thinking that Waldo's two attorneys, not Waldo, were the true winners. This is good work if you can get it.

Title VII grants courts "discretion" to award "prevailing" parties "a reasonable attorney's fee." 42 U.S.C. § 2000e-5(k). "Abuse of discretion" is a phrase of many meanings, and many of them—in isolation—give the district court's decision the air of plausibility. A district court has a front-row seat at the trial (or, I should say, trials), and accordingly an appellate court distant in time and place should not lightly second guess its assessments of a reasonable fee. Unduly rigorous appellate review of fee awards creates the risk of satellite litigation that leads to more satellite litigation over matters that have nothing to do with the underlying cause of action. Trial court discretion includes in appropriate cases the right to award fees for work done on interrelated causes of action, even when the claimant loses some (even perhaps six of seven) of the interrelated claims and even when four of the seven claims arise under state law. And in some cases it may even be appropriate to grant fees for losing a trial in all respects if the claimant manages to win the same claim in a second trial.

But the acceptance of these points in the aggregate here gives trial court discretion a bad name. I know of no case in which an appellate court upheld all fees for the first (losing) trial when the only reason for the second trial was the trial court's granting of a new trial under Civil Rule 59(a)(1)(A), which is to say that the verdict was merely against the weight of the evidence, which is to say that the evidence *would have*

*permitted* a defense verdict to stand. *See White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992). There was nothing unfair about the first trial. Defense counsel did nothing wrong. The trial court did nothing wrong. And the jury did nothing wrong, as the evidence would have permitted a defense verdict to stand. All that happened was that the trial judge disagreed with the jury. If anyone did anything wrong, it was plaintiff's counsel in failing to convince the jury to rule his way in the initial trial. No reduction, any reduction, for all of the work on the first trial? That is a heavy lift. Where, moreover, would this end? Would a second lost jury verdict and a second successful Civil Rule 59 motion for a second do-over permit fees as well? Some reduction was in order.

The majority's citations hold nothing to the contrary. The lead case, *Shott v. Rush-Presbyterian-St. Luke's Medical Center*, 338 F.3d 736, 741–42 (7th Cir. 2003), *rejected* the claim for fees. While the other cases upheld fee awards, they did so in distant and distinct settings. *See Flitton v. Primary Residential Mortg., Inc.*, 614 F.3d 1173, 1177 (10th Cir. 2010) (upholding fee award for three "interrelated" Title VII claims—compensatory damages for retaliation, compensatory damages for discrimination and punitive damages for retaliation—when plaintiff won part of the first trial and part of the second trial); *Abner v. Kansas City S. Ry. Co.*, 541 F.3d 372, 384 (5th Cir. 2008) (awarding fees for first trial in which "[t]he jury simply could not reach a verdict"); *O'Rourke v. City of Providence*, 235 F.3d 713, 737 (1st Cir. 2001) (awarding fees for first trial where plaintiff *won* at trial, only to have judgment in that trial erroneously vacated by the district court and *reinstated* by the court of appeals); *Gierlinger v. Gleason*, 160 F.3d 858, 877–78 (2d Cir. 1998) (awarding fees incurred during a prior trial that ended in a mistrial, where the mistrial was primarily due to the court's error—not the plaintiff's). None of these cases involve what we have here—winning all fees by losing all claims in an error-free jury trial on the merits.

Two of the majority's citations offer more of the same and indeed cut against its conclusion and reasoning. In *Jordan v. City of Cleveland*, unlike in this case, the plaintiff "prevailed on a substantial number of claims that he pursued." 464 F.3d 584, 604 (6th Cir. 2006). More significantly, the presentation of the unsuccessful claims

(discrimination and harassment) were *necessary* for a complete presentation of the successful one (retaliation for complaining about the same discrimination and harassment). Here we have the opposite situation: It was the *harassment* claim that succeeded, making it independent of, not dependent on, the retaliation claim. Nor, as the majority suggests, does *City of Riverside v. Rivera*, 477 U.S. 561 (1986), establish that the amount of damages awarded in a case has no bearing on the proper size of a fee award. Maj. Op. at 24 n.4. It rejects only the idea that § 1988 fees "should *necessarily* be proportionate to the amount of damages," *id.* at 574 (emphasis added), obviously true in view of the possibility of claims for injunctive relief or nominal damages. But *City of Riverside* acknowledges and supports the equally obvious proposition pertinent to and ignored in this case—that in the normal course the amount of damages is "certainly relevant" to the size of a proper fee award and is "one of many factors that a court should consider." *Id.* at 574. Just so here—and nowhere accounted for in the district court's decision. Nor does it seem likely that the same Congress that capped compensatory damages at $300,000 and prohibited punitive damages for this merits claim would have been cheerfully indifferent to runaway, if not punitive, fee awards that bear no relation to this damages award.

In the aggregate, the district court lost sight of the reality that the "reasonable[ness]" of a fee award turns in part on the level of a plaintiff's success—the extent to which he "prevail[ed]." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). If "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id.* at 436. That is true even in cases "where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Id.* And that makes sense in view of the Court's directive to award "only that amount of fees that is reasonable in relation to the results obtained." *Id.* at 440; *see also Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 552 (6th Cir. 2008) (explaining that courts should consider "whether the plaintiff achieved a sufficient degree of success to render the hours reasonably expended a satisfactory basis for awarding attorney fees").

*Hensley* itself offers a spot-on comparison. The Court indicated that a fee award nearly identical to this one—an award for the time spent on six claims when the plaintiff won just one—"clearly would have been excessive." 461 U.S. at 436. Yes, indeed. Nor was today's case one in which it was difficult to make a rough cut between the fees for the successful federal claim and the fees for the unsuccessful federal and state law claims. When it is not "difficult to divide the hours expended on a claim-by-claim basis," *id.* at 435, a district court should do so. The district court judge herself showed this was just such a case by ordering a new trial on Waldo's harassment claim but not her retaliation claim. The two claims are distinguishable in the abstract, and the district court showed they were distinguishable in the here and now. Even Waldo's counsel at trial argued for the exclusion of certain evidence based on the differences between the legal claims, and her counsel must have understood the distinction between the federal and state law claims when she withdrew *all* of the state claims, one before the first trial and the remaining three before the jury deliberations in the first trial.

I am prepared to hold my nose in upholding a lot of fee awards, whether they seem too small or too large at the time. But a blanket fee award of $684,506 for losing six of seven claims, including for *all* of the work in losing the first jury trial, is not one of them.